## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C. CLARK HODGSON, JR., RECEIVER FOR PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC, AND ITS PARTNERS, AFFILIATES, SUBSIDIARIES AND RELATED ENTITIES, | : : : : : : | |
| Plaintiff, | : : | Civil Action No. |
| v. | : : | |
| MAN FINANCIAL INC, THOMAS GILMARTIN, SEP ALAVI, WILLIAM WAMBACH, TIMOTHY BRAUN, JODY McMILLAN, JAMES ZAMORA AND MONICA RODRIGUEZ, | : : : : : : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## COMPLAINT

Plaintiff, C. Clark Hodgson, Jr., Receiver (the "Receiver") for Philadelphia Alternative Asset Management Company, LLC ("PAAMCo"), and its partners, affiliates, subsidiaries and related entities, including Philadelphia Alternative Asset Fund, Ltd. (the "Offshore Fund"), Philadelphia Alternative Feeder Fund, LLC (the "Feeder Fund"), Option Capital Fund, LP ("Option Capital") and Philadelphia Alternative Asset Fund, LP (the "LP Fund") (PAAMCo, the Offshore Fund, the Feeder Fund, Option Capital and the LP Fund shall hereinafter be referred to collectively as the "Receivership Entities"), by and through his counsel, Stradley Ronon Stevens & Young, LLP, files this Complaint and avers:

1. This is an action for common law negligence, violations of the Commodity Exchange Act, common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act and deepening insolvency, to recover damages from the defendants

for injury and losses suffered by the Receivership Entities as a result of the acts and failures to act of Defendant Man Financial Inc ("Man Financial") and various of its employees, in connection with a fraudulent scheme orchestrated by Paul M. Eustace ("Eustace"), acting individually and through PAAMCo, from approximately June 2004 through June 2005, when the United States Commodity Futures Trading Commission ("CFTC") sued Eustace to enjoin the scheme and obtained the appointment of the Receiver in the related case captioned <u>Commodity Futures Trading Commission v. Paul M. Eustace and Philadelphia Alternative Asset Management Company, LLC</u>, Civil Action No. 05-cv-2973 (MMB), pending in the United States District Court for the Eastern District of Pennsylvania (the "CFTC Action"), and continuing thereafter.

      2.      Through their acts and failures to act, as more fully set forth below, Man Financial and its employees enabled and facilitated the wrongful conduct of Eustace, acting individually and through PAAMCo, and otherwise caused the Receivership Entities to suffer losses.

<b><u>THE PARTIES</u></b>

      3.      Plaintiff, C. Clark Hodgson, Jr., the Receiver, is a citizen of the Commonwealth of Pennsylvania.  The Receiver was appointed receiver for the Receivership Entities pursuant to this Court's Statutory Restraining Order dated June 23, 2005.  The Receiver's appointment was made permanent by the Consent Order entered on September 22, 2005.  The Receiver was thereafter re-appointed by Order dated April 21, 2006.  The Receiver is authorized by law to bring this action on behalf of the Receivership Entities, including the Offshore Fund.

# 469565  v. 1

4.     Defendant Man Financial is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in a jurisdiction other than the Commonwealth of Pennsylvania.  At all times material hereto, Man Financial was a futures commission merchant ("FCM") through which the Offshore Fund traded commodity futures and options.

5.     Upon information and belief, Defendant Thomas Gilmartin ("Gilmartin") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, Gilmartin was Senior Vice President at Man Financial and the broker in charge of the Offshore Fund's accounts.  He was also a shareholder of PAAMCo through December 2004, at which time he sold his shares to PAAMCo with the understanding that he could buy back his shares over the next two years if PAAMCo cancelled its National Futures Association membership.

6.     Upon information and belief, Defendant Sep Alavi ("Alavi") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, Alavi was an employee of Man Financial, under the direct supervision of Gilmartin.

7.     Upon information and belief, Defendant William Wambach ("Wambach") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, Wambach was an employee of Man Financial and the supervisor of the back office in the Chicago branch of Man Financial, and was charged with the responsibility of accurately reporting trades.

8.     Upon information and belief, Defendant Timothy Braun ("Braun") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, Braun was an employee of Man Financial and a member of the back office at Man Financial.

# 469565 v. 1

9.      Upon information and belief, Defendant Jody McMillan ("McMillan") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, McMillan was an employee of Man Financial and a member of the back office at Man Financial.

10.      Upon information and belief, Defendant James Zamora ("Zamora") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, Zamora was an employee of Man Financial and the head of the U.S. Credit and Risk Department at Man Financial.

11.      Upon information and belief, Defendant Monica Rodriguez ("Rodriguez," together with Gilmartin, Alavi, Wambach, Braun, McMillan and Zamora, the "Employee Defendants") is a citizen of a State other than the Commonwealth of Pennsylvania.  At all times material hereto, Rodriguez was an employee of Man Financial and a Senior Credit Analyst in the U.S. Credit and Risk Department at Man Financial.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, in that it arises under the laws of the United States, and 1332, in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different States.  In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 754 and 1692.

13.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 754 and 1692.

## BACKGROUND

14.      The wrongful and negligent acts of Man Financial arise out of numerous activities, including the opening of the Offshore Fund's accounts at Man Financial, the back-

- 4 -

# 469565  v. 1

dating of certain trades and the related failure to keep appropriate records of those transactions, the restricting of access to certain of the Offshore Fund's accounts through Man Financial's E-Midas system, the failure to advise the Offshore Fund's fund administrator of all of the Offshore Fund's accounts, the trading and transfers between certain of the Offshore Fund's accounts, the failure to advise certain investors or potential investors in the Offshore Fund of the true value of the Offshore Fund's accounts, the failure to reveal the existence of certain accounts to members of the Board of Directors and employees of PAAMCo, the failure to monitor and evaluate the risks posed by trading in the Offshore Fund's accounts, the making of errors in the effecting of trades for the Offshore Fund's accounts and the failure of supervision of Man Financial's employees acting within the scope of their employment.

15.     From approximately June 2004 through June 2005, Eustace, acting individually and through PAAMCo, operated the Offshore Fund and the Feeder Fund.  The Feeder Fund was an investor in the Offshore Fund, and allowed customers in the United States to participate in the Offshore Fund.  The Offshore Fund was launched in June 2004 and the Feeder Fund was in operation as of October 2004.  Option Capital was launched in April 2001, and the LP Fund was launched in August 2002.

16.     Eustace was President of PAAMCo and controlled its overall day-to-day operations.  Eustace is the only registered associated person and listed principal of PAAMCo, controlled the trading conducted by PAAMCo on behalf of the Offshore Fund and had sole trading authority over the Offshore Fund accounts at Man Financial.

17.     Beginning in January 2005 and continuing through June 2005, the Offshore Fund sustained severe trading losses in the accounts held at Man Financial, which losses totaled more than $147 million.

# 469565  v. 1

18.     In 2005, Eustace posted or caused to be posted on PAAMCo's website, www.paamcollc.com, reports of profitable net returns for the Offshore Fund and used these same false returns to calculate performance reports for Option Capital and the LP Fund.  In or about May 2005, Eustace, acting individually and through PAAMCo, posted on that website the following 2005 net returns for the Offshore Fund:  0.88% in January; 1.25% in February; 1.56% in March; 1.69% in April; and a year-to-date net return of 5.5%.

19.     In fact, the Offshore Fund's commodity futures and options trading accounts sustained the following approximate losses in 2005:  January -$1.0 million (-0.56%); February -$19.2 million (-10.2%); March -$6.6 million (-3.85%); April -$34.4 million (-16.43%); and May -$87.8 million (-46.19%).  The actual net asset value of the Offshore Fund at the end of May 2005 was approximately $103 million.  However, the account statements for May 2005 incorrectly reflected that the Offshore Fund had a net asset value of over $260 million at the end of May.

**Man Financial Permitted the Improper Opening the Offshore Fund Accounts**

20.     On July 2, 2004, Eustace, in his purported capacity as Secretary and President of the Offshore Fund, opened account E 159 00 15910 with Man Financial (the "10 Account").  Man Financial accepted Eustace's signature as the President and Secretary of the Offshore Fund in opening the 10 Account, though no such positions existed in the Offshore Fund.  See Articles of Association ("Articles") of the Offshore Fund, attached hereto as Exhibit "A."  At the time that the 10 Account was opened, Gilmartin either knew or should have known that Eustace was not President or Secretary of the Offshore Fund.

21.     At all times from the inception of the Offshore Fund through June 23, 2005, Eustace was an officer of PAAMCo, the investment manager for the Offshore Fund, and

was the agent through whom PAAMCo acted at all times material hereto, but was not an officer, shareholder or director of the Offshore Fund itself.

22.     The Articles authorize only directors of the Offshore Fund to open trading accounts or otherwise conduct the business affairs of the Offshore Fund.

23.     Moreover, paragraph 2 of the Trading Advisory Agreement between PAAMCo and the Offshore Fund (the "Trading Advisory Agreement"), a copy of which was in the possession of Man Financial when the 10 Account was opened, significantly limits the authority of the investment manager, PAAMCo, to act on behalf of the Offshore Fund and, as such, prohibits the investment manager from opening accounts. See Trading Advisory Agreement, attached hereto as Exhibit "B."

24.     Despite the restrictions imposed by Section 2 of the Trading Advisory Agreement and the Offshore Fund's Articles, Man Financial permitted Eustace to open the 10 Account with a corporate resolution, also signed by Eustace, purportedly as "Secretary" of the Offshore Fund, as the only evidence of Eustace's authority to open the 10 Account on behalf of the Offshore Fund.

25.     At the time that the 10 Account was opened, Man Financial did not require a copy of the Offshore Fund Articles and inappropriately relied upon a single signature, that of Eustace alone, and his representations that he somehow had authority to act for the Offshore Fund when the Trading Advisory Agreement that he produced and the Articles clearly state that he did not have such authority.  Therefore, Man Financial knew or should have known that Eustace had no authority to open accounts for the Offshore Fund.

26.     Eustace's main contact at Man Financial and the person who oversaw the opening of the 10 Account was Gilmartin.  Gilmartin was the Account Executive in charge of the

# 469565  v. 1

Offshore Fund's accounts.  Gilmartin, a college friend of Eustace, was a Senior Vice President at Man Financial and had primary responsibility for the Offshore Fund accounts at Man Financial. At the time that the 10 Account was opened, Gilmartin was also a shareholder of PAAMCo and knew or should have known that Eustace was not an employee or officer of the Offshore Fund and that Eustace did not have authority to open accounts for the Offshore Fund.

27.    In the ordinary course of its business, Man Financial made available to UBS Fund Services (Cayman) Ltd. ("UBS"), the Offshore Fund's fund administrator, the results of all trading in the 10 Account on a daily and monthly basis through an internet system known as "E-Midas."  Upon information and belief, UBS also made the monthly account information available to the investors of the Offshore Fund shortly after the end of each month.

28.    UBS prepared the monthly account, or net asset value, statements based upon, inter alia, Offshore Fund account information it accessed through Man Financial's E-Midas system.  Eustace knew that UBS relied upon the E-Midas system for account information for the Offshore Fund.

29.    On March 1, 2005, Man Financial allowed Eustace to open yet another account in the name of the Offshore Fund, account E 159 00 15950 (the "50 Account").  Once again, Man Financial accepted Eustace's signature as "President" of the Offshore Fund in opening the account, though (i) no such office or position existed within the Offshore Fund, and (ii) Eustace did not produce any evidence to Man Financial that the directors of the Offshore Fund authorized Eustace to open another account or cross-margin the 50 Account with the 10 Account.

30.    As with the 10 Account, Gilmartin oversaw the opening of the 50 Account at Man Financial.  Gilmartin was still the Senior Vice President in charge of the Offshore Fund's

# 469565  v. 1

accounts and the placing of trades at the time that the 50 Account was opened.  Upon Gilmartin's

request and based on the paperwork submitted by Eustace, Man Financial allowed the 50

Account to be linked to and cross-margined with the 10 Account.

### Man Financial Assisted in the Back-Dating of Certain Trades and Failed to Keep the Requisite Records of These Transactions

31.     An EFP ("exchange for physical") is a form of privately negotiated

physical settlement of long and short futures positions held by two parties.  Generally, the parties

take an exchange traded futures position, and privately negotiate their physical trade.  Then,

instead of offsetting their futures positions with subsequent trades on the exchange, they inform

the exchange that they want to transfer the futures from one party to the other at an agreed upon

price, thus offsetting and closing out their respective positions.

32.     Beginning in October 2004  and continuing thereafter until the Receiver

was appointed, Eustace caused Man Financial to convince UBS to back-date certain EFP trades

made on currency exchanges, at month end, and to artificially report that numerous large trades

occurred at market highs or lows on the last trading day of the prior month instead of the first

day of the following month, notwithstanding how they were reported on the daily and monthly

statements, in order to artificially boost the month-end returns of the 10 Account.

33.     Eustace, acting individually and through PAAMCo, formulated this

scheme in 2004 and used it at least once in October 2004 to improve the apparent performance of

the Offshore Fund.  As a result, UBS reported net asset value in October 2004 as $97.6 million,

whereas the actual net asset value was approximately $96.3 million.

34.     Thereafter, Eustace executed several EFPs on February 1, 2005, using the

knowledge of the settlement prices for January 31 to set the futures prices on the EFPs.  Eustace,

acting individually and through PAAMCo, manipulated the information regarding these trades

# 469565  v. 1

and caused Man Financial to send such manipulated information to UBS to have it appear that the EFPs were executed on January 31, not February 1. Because Eustace, acting individually and through PAAMCo, with the assistance of Man Financial, was able to do this, he was able to select prices for the EFPs executed on February 1 based upon the January 31 settlement prices, and thus have profitable EFPs posted for January to improve the apparent performance for that month. The false explanations of alleged reporting delays sent by Man Financial to UBS caused UBS to make adjustments to the Offshore Fund's account reconciliations which falsely improved the results for January 2005 by $2.6 million and concealed the actual losses sustained by the Offshore Fund. If Man Financial had not sent such manipulated information to UBS for these EFPs posted to January 31, UBS would have correctly reported a negative return for the Offshore Fund in January 2005.

35.    In order to ensure that UBS would include these profitable transactions in the previous month's results, Man Financial, Gilmartin and Alavi, acting upon the request of Eustace, individually and on behalf of PAAMCo, and without internal verification at Man Financial, misrepresented to UBS that the trades were omitted from the last-day-of-the-month report because of a delay in Man Financial's reporting system for certain EFP trades.

36.    On several occasions, Eustace, acting individually and through PAAMCo, sent Gilmartin and Alavi e-mails with text that he wanted these Man Financial employees to copy and send to UBS to justify back-dating certain EFP trades and convince UBS to make these adjustments to the month-end statements. Gilmartin and Alavi simply copied Eustace's false explanations verbatim and sent them to UBS without verifying the accuracy of the representations that they were making in an effort to convince UBS to back date certain trades

appearing on the first day of the following month.  Copies of those e-mail requests from Eustace to Gilmartin and Alavi are attached hereto as Exhibit "C."

37.     These EFP transactions appear more fully in the month-end account reconciliations prepared by UBS as a result of Man Financial's assurance to UBS that the adjustments were legitimate and warranted.  Many of these types of transactions were somehow booked by Man Financial at a price that was outside the range in which such assets traded on the date that Gilmartin and Alavi, acting on behalf of Man Financial, alleged that the trades occurred.  An example of one such account reconciliation is attached as Exhibit "D."

38.     Man Financial's participation in artificially inflating the reported returns of the Offshore Fund caused investors in the Offshore Fund and Feeder Fund, as well as investors in Option Capital and the LP Fund, to continue to invest and/or remain invested in the respective funds from January 31, 2005, through the June 23, 2005, appointment of the Receiver. Man Financial prevented the investors in the Offshore Fund, the Feeder Fund, Option Capital and the LP Fund (collectively, the "Receivership Funds") from mitigating their losses by allowing Eustace, acting individually and through PAAMCo, to artificially inflate month-end returns and allowing Eustace, acting individually and through PAAMCo, to utilize the misleading returns in the Offshore Fund to calculate and distribute false financial information to investors in Option Capital, the LP Fund and the Feeder Fund.

39.     In addition, Man Financial failed to comply with the strict documentation requirements for EFP trades and did not obtain sufficient documentation and proof of the EFP transactions reported in the Offshore Fund's accounts.

**Man Financial Allowed Eustace to Restrict Access to the 50 Account**
**Via the E-Midas System and Failed to Advise UBS of the 50 Account**

40.     Eustace, working through Gilmartin, limited the ability of the office staff of PAAMCo to have access to the 50 Account through the E-Midas system, particularly Edward Gobora ("Gobora"), the office manager of the PAAMCo office in King of Prussia, Pennsylvania, who was the individual responsible for entering information from the Man Financial statements into the PAAMCo internal accounting system.  This information was used by Eustace, acting individually and through PAAMCo, to prepare false account statements and commentary for each of the Receivership Funds.

41.     On the morning of March 2, 2005, one day after the 50 Account was opened, Gobora was accessing the 10 Account on the E-Midas system using Eustace's user name when he saw a reference to the 50 Account, of which he was not previously aware.  He promptly telephoned Gilmartin to ask about the 50 Account, and Gilmartin reported that it was a new account opened by Eustace.  However, when Gobora phoned Eustace to ask about the 50 Account, he was told repeatedly that there was no such account.

42.     Eustace, with the assistance of Gilmartin and Man Financial, thereupon set out to conceal the existence of the 50 Account from Gobora and others outside of Man Financial having access to Offshore Fund accounts via the E-Midas system through Eustace's user name.

43.     By e-mail dated March 2, 2005, a copy of which is attached hereto as Exhibit "E," Eustace, acting individually and through PAAMCo, inquired as to what user name had access to the 50 Account via the E-Midas system.  Upon learning that access to the 50 Account was available to anyone knowing Eustace's user name, which Eustace had previously provided to Gobora, Eustace, acting individually and through PAAMCo, instructed Man Financial, on March 4, 2005, to change the user name for access to the 50 Account to a name

# 469565 v. 1

known only to Eustace.  Based upon the timing of the requested change immediately following

inquiries by Gobora, Gilmartin, and therefore Man Financial, knew, or should have know, that

the purpose of Eustace's request to change the user name was to prohibit Gobora and others from

learning the details or existence of the 50 Account and accessing account statements for such

account on E-Midas.  The requested changes only affected the 50 Account, and Man Financial

continued to provide E-Midas access to all other accounts of the Offshore Fund with the original

Eustace user name so as not to draw any suspicion from Gobora or UBS.

44.     As a result of Man Financial's acquiescence in Eustace's scheme, Gobora

was deprived of further access to the 50 Account via the E-Midas system and was led to believe

that the 50 Account did not belong to the Offshore Fund or any other of the Receivership Funds.

45.     Thus, with regard to the 50 Account only, Man Financial did not allow

anyone outside of Man Financial, other than Eustace, to have access to the results of the trading

through the E-Midas system.  Similarly, Man Financial did not provide any notation or other

indication on any of the 10 Account statements on the E-Midas system that would have alerted

UBS that the 10 Account was cross-margined with or otherwise related to the 50 Account or that

the 50 Account even existed.

46.     By establishing the 50 Account and using a different and restricted list of

recipients to receive daily and monthly performance reports for the 50 Account, Eustace, acting

individually and through PAAMCo, with the help of Gilmartin and Man Financial, prevented

UBS, the fund administrator and the entity responsible for providing performance results and net

asset value reports to the Offshore Fund's investors, from having access to the 50 Account and

thereby permitted the fund administrator to see only an incomplete and misleading picture of the

Offshore Fund's performance.  Man Financial permitted Eustace to have the only access to the

# 469565  v. 1

50 Account statements on E-Midas and, thereby, allowed him to make this one account different from all other Offshore Fund accounts.

47.    The trading results in the 10 Account were transparent to UBS and thereby reported to investors, but, as a result of the secrecy surrounding the 50 Account, the true trading results in the 50 Account were hidden from UBS and, therefore, from the investors in the Receivership Funds.  Thus, while at all times after February 28, 2005, Man Financial maintained three active trading accounts for the Offshore Fund, it only reported the daily and monthly trading results of two of those accounts to the Offshore Fund's administrator, UBS.  It was only through the E-Midas system that UBS received account information from Man Financial. Neither Eustace nor Man Financial ever informed UBS of the 50 Account.

48.    In addition to the 10 Account and the 50 Account, the Offshore Fund maintained, with a Man Financial affiliate, a third active account in which the Offshore Fund traded currencies and options relating to foreign exchange (the "FX Account").  Unlike the 50 Account, the trading results of the FX Account were reported to UBS, through an internet system similar to E-Midas, for inclusion in its net asset value calculations for the Offshore Fund.  UBS's net asset value calculations for the Offshore Fund never included the 50 Account at Man Financial.

49.    As a result of Man Financial's actions in reporting only the trading results of the 10 Account and the FX Account and preventing third-party E-Midas access to the daily and monthly reports for the 50 Account, Man Financial blocked UBS and therefore the Offshore Fund's investors from seeing the true results of all of the cross-margined Offshore Fund accounts, and only permitted UBS to have an incomplete view of all of the linked Offshore Fund accounts at Man Financial.  As a result of this incomplete view of all cross-margined Offshore

# 469565  v. 1

Fund accounts, Eustace, acting individually and through PAAMCo, with the assistance of Man Financial and its employees, was able to hide losing positions and trading losses in the 50 Account, thereby providing UBS and the investors in the Receivership Funds with an incomplete and inflated picture of the Offshore Fund's performance.

50.     Further, Eustace, acting individually and through PAAMCo, used the artificially inflated returns of the Offshore Fund's performance to fraudulently calculate and disseminate to investors false returns in the Option Capital and the LP Fund, a fact that Gilmartin and others at Man Financial knew or should have known.

51.     From March 2005 through June 2005, the 50 Account sustained losses of more than $179 million; from January 2005 through June 2005, the 10 Account reflected a gain of $31.7 million.

**Man Financial Facilitated Trading Between the 10 Account and the 50 Account**

52.     Upon information and belief, Eustace, acting individually and through PAAMCo, with the knowledge and assistance of Man Financial employees, engaged in conduct with regard to the accounts that the Offshore Fund maintained at Man Financial that allowed massive losses to accumulate unnoticed in the 50 Account and artificially increased the Offshore Fund's returns.

53.     On March 1, 2005, Eustace, acting individually and through PAAMCo, caused, and Man Financial allowed, the 50 Account to purchase two substantial bond positions from the 10 Account as if the trade had been placed on the market.  Importantly, Man Financial allowed the 50 Account to purchase the substantial bond positions at the price that the 10 Account paid for the positions rather than the current market price, which had then dropped well below the price actually paid by the 10 Account when it originally acquired the bond positions.

54.     In so doing, Man Financial also, at the request of Eustace, acting individually and through PAAMCo, and without any justification, back-dated these purported trades to February 28, 2005, and placed them in the 50 Account the day before the 50 Account even existed.  The sale of these two substantial bond transactions caused the 50 Account, rather than the 10 Account, to realize and suffer substantial losses in market value from holding the losing positions, thus cleansing the 10 Account of these losing positions in order to artificially inflate the February month-end performance of the accounts reported to UBS and the investors. These acts resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account.

55.     As part of the purported trading of these bond positions from the 10 Account to the 50 Account, Man Financial charged the Offshore Fund substantial commissions in the 10 Account for the sale of both positions and substantial commissions in the 50 Account for the purchase of both positions.  When the fictitious trade was completed, Man Financial had charged the Offshore Fund commissions of $99,152.40 simply to move two positions from one account of the Offshore Fund to another, while making it appear as a trade on the floor of the Chicago Board of Trade, which it was not, instead of a transfer between related accounts of a single customer.  Moreover, by moving the positions into the hidden 50 Account, Man Financial deceived UBS and the investors into believing that the Offshore Fund no longer held those losing positions.

56.     The ultimate effect of the "trade" of the positions was that a losing transaction was removed from the 10 Account on February 28, 2005, by an artifice designed by Eustace, acting individually and through PAAMCo, and Man Financial to hide the substantial market value losses and thereby eliminate such unrealized losses from the February month-end

statements of the 10 Account and mislead investors in the Offshore Fund, as well as investors in the other Receivership Funds, about the Offshore Fund's actual performance.  Because Man Financial was not permitting UBS to have access to the 50 Account, the loss transferred to the 50 Account at cost, rather than at the then-existing market price, was isolated in the 50 Account and remained hidden from UBS and, therefore, investors in the Receivership Funds.  Copies of the account statements showing these transactions are attached hereto as Exhibit "F."

57.     On or about March 7, 2005, Eustace, acting individually and through PAAMCo, instructed Gilmartin to accomplish another so-called trade between the 10 Account and the 50 Account, and Gilmartin asked Braun to make the "trades" between the 10 Account and 50 Account.  A copy of the e-mail string relating to that request is attached hereto as Exhibit "G."

58.     In response, Braun advised Gilmartin that Man Financial should not be engaging in such a transaction, and that while Man Financial had done it as an accommodation a week earlier, Man Financial "cannot continue to do this," and further stating that "we should not be doing this."

59.     In response, Gilmartin pressed for an exception, reminding Braun, Wambach and Chris Meyer ("Meyer"), who worked under Wambach in the back office in the Chicago branch of Man Financial, that in October 2004, their group had made a $600,000 error in the handling of the Offshore Fund's accounts, which error Eustace, acting individually and through PAAMCo, had not pursued, and, further, that the Offshore Fund generated $500,000 per month in commissions.  Specifically, Gilmartin wrote:

> This is the same customer that let your group out of a $600,000 error last October.  This customer also generates $500,000/month on commissions.  I think an exception is in order here."

# 469565  v. 1

60.     Wambach replied to Gilmartin that what he was requesting, and what Man Financial and Wambach's group had already done on March 1, 2005, between the 10 Account and 50 Account, was a "serious exchange rule violation," and that Man Financial should not violate the exchange rules a second time.

61.     In a message sent on the same date from Meyer to Christopher Smith ("Smith"), upon information and belief the international head of all back office functions at Man Financial's parent company, Man Group plc ("Man Group"), Meyer warned Smith that Gilmartin was using the back office's prior error concerning the Offshore Fund as extortion to coerce the back office to engage in conduct that they knew to be inappropriate and notified Smith of the "unprofessional" way in which Gilmartin was conducting business for Man Financial.  On the following day, Wambach complained to Smith about the same conduct of Gilmartin, but no action appears to have been taken by Smith, Wambach, Meyer, Man Financial or Man Group in response to the alleged extortion and coercion by Gilmartin.  Copies of the e-mails from Meyer and Wambach to Smith about Gilmartin's conduct are attached hereto collectively as Exhibit "H."

62.     Immediately thereafter, after further prodding by Gilmartin, Wambach advised Gilmartin, Braun and Meyer that he had been investigating a manner in which to address Eustace's request.  According to Wambach, while admitting that the rules did not allow for transfers between accounts for liquidation during the spot month, he had found that the two accounts were being reported under the same number, and thus an account change for the two accounts would not actually be for liquidation.  Rather than creating trades to offset the positions, he proposed simply moving existing trades from one account to the other.

63. Thus, after Man Financial's back office declared that so-called trades of positions between the 10 Account and 50 Account were not legal because they were related accounts of a single Man Financial customer, Eustace, acting individually and through PAAMCo, with the assistance and coaxing of Gilmartin, the suggestion of Wambach and the knowledge and acquiescence of Braun and Meyer, utilized the artifice of moving trades from one account to the other by canceling the trade in the 10 Account as though it was a mistake and moving it to the 50 Account "as of" the date the position was actually acquired in the 10 Account. The cancelled and "as of" trades allowed Eustace, acting individually and through PAAMCo, to hide losses and losing positions by canceling them from the 10 Account, as though they had never occurred and moving them to the hidden 50 Account where the losses would not be reported to investors. Rather than transferring positions from the 10 Account to the 50 Account, which would have resulted in a record of such transfer being made in the 10 Account, Eustace, acting individually and through PAAMCo, caused Man Financial to use the artifice of a cancelled and "as of" trade to conceal the movement of the positions.

64. This course of conduct was repeated on numerous occasions. For example, Eustace, acting individually and through PAAMCo, upon realizing that a certain transaction or position was not profitable or was declining in market value, would cause Man Financial, acting through Wambach, Braun and McMillan, to cancel the transaction in the 10 Account, as if it was a mistake and never should have occurred, and have Man Financial move the losing transaction to the 50 Account with an "as of" notation to back-date it to the date that the original position was acquired in the 10 Account.

65. Because the 10 Account was transparent and the 50 Account was hidden, Man Financial, acting through Wambach, Braun and McMillan, allowed Eustace, acting

# 469565 v. 1

individually and through PAAMCo, to utilize the cancellation and movement of these positions between the 10 Account and the 50 Account as an artifice to isolate and hide losing transactions in the 50 Account and thereby conceal from UBS, the investors in the Receivership Funds and the PAAMCo board and employees the true financial results of the investments made on behalf of the Offshore Fund.

66.    Once cancelled, if done before the last day of the month, the cancelled positions would not appear in the monthly statements for the account in which they were cancelled.  These cancelled transactions appear more fully only in the daily account statements for the 10 Account and the 50 Account, examples of which are attached hereto as Exhibit "I."

## Man Financial Failed to Advise Certain Investors or Potential Investors of the True Value of the Offshore Fund Accounts

67.    On March 30, 2005, Eustace, acting individually and through PAAMCo, sent Alavi an e-mail asking him to send an e-mail from Man Financial to a potential investor in the Offshore Fund, Arun Loomba, misrepresenting and grossly overstating the net asset value of the Offshore Fund at "approximately $200 million."  A copy of the e-mail string containing this request is attached hereto as Exhibit "J."

68.    Alavi immediately asked Gilmartin whether he should do so, and Gilmartin agreed that Alavi should copy the text verbatim and send the e-mail that Eustace requested.

69.    Neither Gilmartin nor Alavi undertook any investigation, before or after sending the e-mail, to determine what the correct net asset value of the Offshore Fund actually was.

70.    Despite the lack of any investigation whatsoever, Alavi wrote to Mr. Loomba, using Eustace's exact words, and represented that the net asset value of the Offshore

Fund as of March 30 was approximately $200 million.  A copy of that e-mail chain is attached hereto as Exhibit "K."

71.     In fact, at the time of this communication to Mr. Loomba from Alavi, on behalf of Man Financial, the true net asset value of the Offshore Fund was approximately $33,844,720 less than represented by Alavi because of the then-existing losses hidden in the 50 Account which were not included in the net asset value calculations for the Offshore Fund performed by UBS.

## Man Financial Hid the 50 Account from PAAMCo's Board of Directors and Employees

72.     In order to make an on site determination as to the possible existence of the 50 Account, John Wallace ("Wallace"), a member of the Board of Directors of PAAMCo, traveled to New York City on May 10, 2005, for the express purpose of visiting the offices of Man Financial. Without first putting Man Financial on notice of his visit, Wallace called Gilmartin via cell phone from outside the Man Financial offices, and asked for a meeting with Gilmartin.

73.     Wallace was let into Man Financial's office, and taken to Gilmartin's trading desk.  Wallace asked Gilmartin to pull the Offshore Fund's accounts up on Gilmartin's computer so that Wallace could review those accounts first-hand.

74.     Despite the fact that the 50 Account had been in existence since the beginning of March 2005, and despite Wallace's express request that Gilmartin make all of the Offshore Fund's accounts at Man Financial available to Wallace on Gilmartin's computer, Gilmartin took such steps as were necessary to conceal the 50 Account, so it did not appear on Gilmartin's computer with the other Offshore Fund accounts that were available for viewing by Wallace.

# 469565  v. 1

75.     Gilmartin's failure to reveal the 50 Account to Wallace during the May 10 visit prevented Wallace from having a complete picture of the Offshore Fund's trading activity or accurate understanding of the Offshore Fund's then-current account balance at Man Financial despite the fact that Gilmartin knew, or should have known, that as a member of the Board of Directors of PAAMCo, Wallace was entitled to have access to this information.

### Man Financial Failed to Monitor and Evaluate the Risks Posed by the Trading and Other Activities in the Offshore Fund's Accounts

76.     Contrary to its customary practice of obtaining and reviewing a monthly report that shows the financial performance, including redemptions, subscriptions, net investing income and fees, of any fund for which Man Financial serves as FCM, Man Financial did not obtain and review such routine financial information from the Offshore Fund.

77.     Although the Offshore Fund had been trading since June 2004, no one at Man Financial even began requesting such routine financial information concerning the Offshore Fund until March 4, 2005.

78.     On March 4, 2005, Rodriguez sent an e-mail to Gilmartin requesting certain financial information about the Offshore Fund.  The March 4, 2005, e-mail from Rodriguez to Gilmartin went unanswered, and it was not until May 25, 2005, when Man Financial first made a margin call to the Offshore Fund, that Rodriguez followed up with Gilmartin in an effort to obtain an immediate update on the Offshore Fund's net assets and net asset history, since the Offshore Fund still had not been providing monthly financial information. A copy of the e-mail string containing the requests for financial information about the Offshore Fund is attached hereto as Exhibit "L."

79.     Between February 28 and May 25, 2005, when Rodriguez finally followed up on the Offshore Fund's failure to provide the requested monthly financial information, the

Offshore Fund had already sustained substantial losses without Rodriguez or Man Financial taking any action to stem such losses or the conduct causing such losses and without reporting the losses to UBS, the Offshore Fund's directors or the Offshore Fund's investors.

80.     On May 25, 2005, Man Financial made a margin call to the Offshore Fund for an amount exceeding $19 Million.

81.     Notwithstanding that Man Financial issued a margin call in excess of $19 million to the Offshore Fund on May 25, 2005, on the same date, Zamora sent e-mails to Stephen Hood and Smith advising them that there was no need for concern about the Offshore Fund's account and reminding them that Man Financial had earned more than $4 million in commissions from the Offshore Fund for the year-to-date.  Copies of the e-mails from Zamora are attached hereto as Exhibit "M."

### Man Financial Made Errors in Liquidating the Offshore Fund Accounts

82.     On June 22, 2005, the CFTC filed a Complaint against Eustace and PAAMCo in the CFTC Action and further filed a motion in the CFTC Action seeking a Receivership Order (the "Receivership Order") applicable to, among others, (i) Eustace, (ii) the Receivership Entities, (iii) all creditors of Eustace and the Receivership Entities and (iv) all other persons and entities served with the Receivership Order.

83.     On June 23, 2005, this Court entered the Receivership Order appointing the Receiver.  A copy of the Receivership Order is attached hereto as Exhibit "N."

84.     On June 24, 2005, the CFTC served by facsimile transmission a copy of the Receivership Order on Man Financial by sending a copy of the Receivership Order to Man Financial, attention of Joan Ackerman at Man Financial's Chicago offices, and Man Financial has admitted that it received the Receivership Order on that date.

85.     Also on June 24, 2005, the Receiver and representatives of the CFTC had a conference call with Man Financial employees wherein they agreed, in accordance with the Receivership Order, to close all open positions held by the Offshore Fund.

86.     After the Receiver gave the order to close all open positions, Gilmartin mistakenly, carelessly, and without due care sold short positions in certain of the accounts of the Offshore Fund instead of buying to close out existing short positions, in effect, doubling the Offshore Fund's open short positions and creating the need to buy twice as many positions to properly close all open positions.

87.     On June 24, 2005, Gilmartin undertook to close these newly-opened positions but still did not liquidate the original open positions in accordance with the Receiver's directive.  Instead, Gilmartin waited until the following Monday, June 27, 2005, to close the positions as requested by the Receiver.  On information and belief, the Offshore Fund sustained substantial losses as a result of this error, for which it was never compensated by Man Financial.

88.     On June 27, 2005, Gilmartin and Man Financial attempted to liquidate the positions in the Offshore Fund accounts but failed to correctly acquire offsetting positions in the Offshore Funds accounts.  The result of these errors in the liquidation on June 27, 2005, was the creation of new positions for the Offshore Fund that then needed to be closed.

### Man Financial Failed Properly to Supervise its Employees

89.     The Employee Defendants were employees of Man Financial at all times relevant to this action, acting within the course and scope of their employment.

90.     If Man Financial had properly supervised the Employee Defendants, they would not have acted and failed to act as more fully set forth above.

# 469565  v. 1

## COUNT I

### Negligence Against Man Financial

91.     Plaintiff incorporates by reference paragraphs 1 – 90 above as if set forth at length herein.

92.     Man Financial had a duty to the Offshore Fund to act reasonably in the conduct of its business.

93.     Man Financial breached this duty by acting and failing to act as more fully set forth above.

94.     As a direct and proximate result of said Man Financial's breach of this duty, Eustace was able to perpetrate and continue the scheme more fully set forth above against all of the Receivership Funds.

95.     The Offshore Fund has suffered injury to its business and property as a direct and proximate result of the breach of this duty.

96.      The Receiver seeks compensatory and punitive damages, costs, reasonable attorney's fees, and such other relief as the Court may deem just and proper.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for compensatory damages, together with punitive damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

# 469565  v. 1

## COUNT II

### Negligent Supervision Against Man Financial

97.     Plaintiff incorporates by reference paragraphs 1 – 96 above as if set forth at length herein.

98.     Man Financial had a duty to supervise its employees in the performance of their responsibilities.

99.     Man Financial breached this duty by allowing its employees to act and to fail to act as more fully set forth above.

100.    As a direct and proximate result of said Man Financial's breach of this duty, Eustace was able to perpetrate and continue the scheme more fully set forth above.

101.    The Offshore Fund has suffered injury to its business and property as a direct and proximate result of the breach of this duty.

102.    The Receiver seeks compensatory and punitive damages, costs, reasonable attorney's fees, and such other relief as the Court may deem just and proper.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for compensatory damages, together with punitive damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

## COUNT III

### Respondeat Superior Against Man Financial

103.    Plaintiff incorporates by reference paragraphs 1 – 102 above as if set forth at length herein.

# 469565  v. 1

104.    The Employee Defendants were employees of Man Financial acting in the course and scope of their employment as more fully set forth above.

105.    Man Financial was responsible for the acts and failures to act of the Employee Defendants while acting as employees of Man Financial.

106.    The Offshore Fund has suffered injury to its business and property as a direct and proximate result of the acts and failures to act of the Employee Defendants.

107.     The Receiver seeks compensatory and punitive damages, costs, reasonable attorney's fees, and such other relief as the Court may deem just and proper.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for compensatory damages, together with punitive damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

## COUNT IV

### Negligence Against the Employee Defendants

108.    Plaintiff incorporates by reference paragraphs 1 – 107 above as if set forth at length herein.

109.    The Employee Defendants had a duty to the Offshore Fund to act reasonably in the conduct of the business of Man Financial.

110.    The Employee Defendants breached this duty by acting and failing to act as more fully set forth above.

111.    As a direct and proximate result of the Employee Defendants' breach of this duty, Eustace was able to perpetrate and continue the scheme more fully set forth above.

# 469565  v. 1

112.    The Offshore Fund has suffered injury to its business and property as a direct and proximate result of the breach of this duty.

113.     The Receiver seeks compensatory and punitive damages, costs, reasonable attorney's fees, and such other relief as the Court may deem just and proper.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against the Employee Defendants for compensatory damages, together with punitive damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

## COUNT V

### Direct Violation of the Commodity Exchange Act Against Man Financial

114.    Plaintiff incorporates by reference paragraphs 1 – 113 above as if set forth at length herein

115.    Eustace, acting individually and through PAAMCo, concealed the massive trading losses from the Offshore Fund participants, through at least six primary means.

116.    First, as more fully set forth above, Eustace, acting individually and through PAAMCo, manipulated the information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions, thereby artificially bolstering profits and minimizing losses for certain months in the 10 Account.

117.    Second, after opening the 50 Account, Eustace, acting individually and through PAAMCo, immediately took steps to ensure that no one would have access to the 50 Account via E-Midas by instructing Man Financial to restrict access only to him, as more fully set forth above.  As a result, UBS and others, including key PAAMCo personnel, did not have access to the 50 Account through the E-Midas system.

- 28 -

118.     Third, on March 1, 2005, upon the opening of the 50 Account, Eustace, acting individually and through PAAMCo, immediately with the assistance of Man Financial, used fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account, and to establish the long bond position in the 50 Account, as more fully set forth above.

119.     Fourth, on and after March 7, 2005, when Eustace, acting individually and through PAAMCo, requested that Man Financial engage in a similar trade between the 10 Account and the 50 Account, and employees of Man Financial declined, as more fully set forth above, Man Financial devised a  procedure whereby Man Financial, acting at the request of Eustace, acting individually and through PAAMCo, thereafter transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account, also as more fully set forth above.  In like manner, Eustace, acting individually and through PAAMCo, caused Man Financial to move profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account, and to place trades into the 50 Account that became losing positions.

120.     Fifth, Man Financial, at the request of Eustace, acting individually and through PAAMCo, sent e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net asset value of the Offshore Fund, as more fully set forth above.

121.     Sixth, Man Financial hid the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees, as more fully set forth above.

122.     Section 22(a)(1) of the Commodity Exchange Act (the "CEA") provides a private right of action against "[a]ny person . . . who violates [the CEA] or who willfully aids [or] abets . . . a violation of [the CEA] . . . for actual damages resulting from one or more of the

transactions referred to in subparagraphs (A) through (D) . . . and caused by such violation to any person –

> (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money . . . in connection with any order to make such contract;
>
> [and]
>
> (D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract . . . ."

123.    The Offshore Fund made, through Man Financial, contracts of sale of commodities for future delivery (and options on such contracts or any commodities) and deposited with or paid to Man Financial money in connection with orders to make such contracts.  Further, the Offshore Fund purchased or sold such contracts under circumstances where Man Financial manipulated the price of such contracts.

124.    Man Financial violated § 4b(a)(2)(i) – (iii) of the CEA, 7 U.S.C. § 6b(a)(2)(i) – (iii) (2002), in that it (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports or statements to other persons; and/or (3) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or might be used for the purposes set forth in section 4b(a) of the CEA, 7 U.S.C. § 6b(a).

125.    Man Financial knowingly, or with reckless disregard for the truth, violated § 4b(a)(2)(i) – (iii) of the CEA, 7 U.S.C. § 6b(a)(2)(i) – (iii) (2002) by, among other things: (a)

- 30 -

improperly opening the 10 Account and the 50 Account; (b) manipulating the information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account; (c) restricting access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account; (d) allowing fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account; (e) devising a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account; (f) sending e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund; and (g) hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees.

126.     Man Financial violated Section 4c(b) of the CEA, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c), in that it (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to other persons false reports or statements thereof; and/or (3) deceived or attempted to deceive other persons, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option transactions.

127.     Man Financial knowingly or with reckless disregard for the truth, violated Section 4c(b) of the CEA, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a)

– (c), by, among other things: (a) improperly opening the 10 Account and the 50 Account; (b) manipulating the information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account; (c) restricting access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account; (d) allowing fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account; (e) devising a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account; (f) sending e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund; and (g) hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for compensatory damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

# 469565  v. 1

## COUNT VI

Aiding and Abetting Violations of the Commodity Exchange Act Against Man Financial

128.     Plaintiff incorporates by reference paragraphs 1 – 127 above as if set forth at length herein.

129.     Section 22(a)(1) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 25(a)(1) (2002), provides a private right of action against "[a]ny person . . . who violates [the CEA] or who willfully aids [or] abets . . . a violation of [the CEA] . . . for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) . . . and caused by such violation to any person –

> (A) who received trading advice from such person for a fee
> . . . .
>
> [and]
>
> (D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract . . . ."

130.     The Offshore Fund received trading advice from Eustace, acting individually and through PAAMCo.  Further, the Offshore Fund purchased or sold contracts of sale of commodities for future delivery (and options on such contracts or any commodities) under circumstances where Eustace manipulated the price of such contracts.

131.     Eustace violated § 4b(a)(2)(i) – (iii) of the CEA, 7 U.S.C. § 6b(a)(2)(i) – (iii) (2002), in that he (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports or statements to other persons; and/or (3) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for

- 33 -

or on behalf of any other persons, where such contracts for future delivery were or might be used for the purposes set forth in section 4b(a) of the CEA, 7 U.S.C. § 6b(a).

132.    Eustace knowingly, or with reckless disregard for the truth, violated § 4b(a)(2)(i) – (iii) of the CEA, 7 U.S.C. § 6b(a)(2)(i) – (iii) (2002) by, among other things: (a) improperly opening the 10 Account and the 50 Account; (b) causing the manipulating of information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account; (c) causing the restriction of access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account; (d) causing the making of fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account; (e) agreeing to a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account; (f) causing Man Financial to send e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund; and (g) hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees.

133.    Eustace violated Section 4c(b) of the CEA, 7 U.S.C. § 6c(b) (2002), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c), in that he (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to other persons false reports or statements thereof; and/or (3) deceived or attempted to deceive other persons, in or in

- 34 -

connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option transactions.

134.    Eustace knowingly or with reckless disregard for the truth, violated Section 4c(b) of the CEA, 7 U.S.C. § 6c(b) (2002), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10, by, among other things: (a) improperly opening the 10 Account and the 50 Account; (b) causing the manipulating of information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account; (c) causing the restriction of access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account; (d) causing the making of fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account; (e) agreeing to a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account; (f) causing Man Financial to send e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund; and (g) hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees.

135.    Eustace violated Section 4o(1)A of the CEA, 7 U.S.C. § 6o(1)A (2002) in that he was an associated person of PAAMCo who used the mails and means or instrumentalities

of interstate commerce to directly or indirectly employ a device, scheme or artifice to defraud the Offshore Fund.

136.    Eustace knowingly or with reckless disregard for the truth, violated Section 4o(1)A of the CEA, 7 U.S.C. § 6o(1)A (2002), by, among other things: (a) improperly opening the 10 Account and the 50 Account; (b) causing the manipulating of information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account; (c) causing the restriction of access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account; (d) causing the making of fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account; (e) agreeing to a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account; (f) causing Man Financial to send e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund; and (g) hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees.

137.    Eustace violated Section 4o(1)B of the CEA, 7 U.S.C. § 6o(1)B (2002) in that he was an associated person of PAAMCo who used the mails and means or instrumentalities of interstate commerce to directly or indirectly engaged in a transaction, practice or course of business which has operated as a fraud or deceit upon the Offshore Fund.

# 469565  v. 1

138.    Eustace knowingly or with reckless disregard for the truth, violated Section 4o(1)B of the CEA, 7 U.S.C. § 6o(1)B (2002), by, among other things: (a) improperly opening the 10 Account and the 50 Account; (b) causing the manipulating of information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account; (c) causing the restriction of access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account; (d) causing the making of fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account; (e) agreeing to a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account; (f) causing Man Financial to send e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund; and (g) hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees.

139.    Man Financial aided and abetted Eustace in his violations of the CEA with knowledge of Eustace's intent to commit violations of the CEA, with the intent to further those violations and by acting in furtherance of Eustace's objectives, as more fully set forth above.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for

compensatory damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

## COUNT VII

### Common Law Fraud Against Man Financial

140.    Plaintiff incorporates by reference paragraphs 1 – 139 above as if set forth at length herein.

141.    The acts of Man Financial as aforesaid constitute misrepresentations.

142.    Such misrepresentations were material to the transactions at hand.

143.    Such misrepresentations were made falsely, with knowledge of their falsity or with recklessness as to their truth or falsity.

144.    Man Financial intended that the UBS, the Offshore Fund and the other Receivership Funds rely on such misrepresentations.

145.    The Offshore Fund, UBS and the other Receivership Funds relied on such misrepresentations.

146.    The resulting injuries to the Offshore Fund and the other Receivership Funds were proximately caused by such reliance.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for compensatory damages, together with punitive damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

# 469565  v. 1

## COUNT VIII

### Aiding and Abetting Common Law Fraud Against Man Financial

147.    Plaintiff incorporates by reference paragraphs 1 – 146 above as if set forth at length herein.

148.    The acts of Eustace as aforesaid constitute misrepresentations.

149.    Such misrepresentations were material to the transactions at hand.

150.    Such misrepresentations were made falsely, with knowledge of their falsity or with recklessness as to their truth or falsity.

151.    Eustace intended that UBS, the Offshore Fund and the other Receivership Funds rely on such misrepresentations.

152.    Man Financial aided and abetted the making of such misrepresentations.

153.    The Offshore Fund, UBS and the other Receivership Funds relied on such misrepresentations.

154.    The resulting injuries to the Offshore Fund and the other Receivership Funds were proximately caused by such reliance.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial for compensatory damages, together with punitive damages, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

## COUNT IX

Violations of 18 U.S.C. §§ 1962(c) and (d)
Against Man Financial and the Employee Defendants

155.    Plaintiff incorporates by reference paragraphs 1 – 154 above as if set forth at length herein.

156.    Eustace, acting individually and through PAAMCo, and PAAMCo, acted and failed to act as aforesaid for the purpose of earning incentive fees based on the purported profits as well as management fees based on the purported lawful operation of the Offshore Fund.

157.    Such incentive fees and management fees would not have been earned in amounts and to the extent that they were earned, but for such acts and failures to act on the part of Eustace, acting individually and through PAAMCo, and PAAMCo, and the acts and failures to act on the part of Man Financial and the Employee Defendants.

158.    Man Financial and the Employee Defendants acted and failed to act as aforesaid for the purpose of earning commissions based on the transactions being undertaken by Man Financial and the Employee Defendants on behalf of the Offshore Fund.

159.    Such commissions would not have been earned in amounts and to the extent that they were earned, but for such acts and failures to act on the part of Eustace, acting individually and through PAAMCo, and PAAMCo, and the acts and failures to act on the part of Man Financial and the Employee Defendants.

160.    Eustace, acting individually and through PAAMCo, PAAMCo, Man Financial and the Employee Defendants acted together and in alliance to generate such fees and commissions, to the harm of the Offshore Fund, by:

a.      the opening of the Offshore Fund's accounts at Man Financial,

b.    the back-dating of certain trades and the related failure to keep appropriate records of those transactions,

c.    the restricting of access to certain of the Offshore Fund's accounts through Man Financial's E-Midas system,

d.    the failure to advise the Offshore Fund's fund administrator of certain of the Offshore Fund's accounts,

e.    the trading and transfers between certain of the Offshore Fund's accounts,

f.    the failure to advise certain investors or potential investors in the Offshore Fund of the true value of the Offshore Fund's accounts,

g.    the failure to reveal the existence of certain accounts to members of the Board of Directors and employees of PAAMCo,

h.    the failure to monitor and evaluate the risks posed by trading in the Offshore Fund's accounts,

i.    the making of errors in the effecting of trades for the Offshore Fund's accounts, and

j.    the failure of supervision of Man Financial's employees acting within the scope of their employment.

161.    The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq. (2005), provides, in § 1962(c):

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity or collection of unlawful debt.

- 41 -

162.    Man Financial and the Employee Defendants are "person(s)" as defined in 18 U.S.C. § 1961(3).

163.    Man Financial, the Employee Defendants, Eustace and PAAMCo, associated-in-fact, constitute a RICO "enterprise" as defined in 18 U.S.C. § 1961(4), in that such individuals and entities, on an ongoing formal and informal basis, as a continuing unit, and in concert with each other, as alleged above, have together conducted their enterprise's affairs for the purpose of generating incentive fees, management fees and commissions, as aforesaid.

164.    The Offshore Fund and the other Receivership Funds have suffered injury to their businesses or property proximately caused by the RICO violations as alleged herein, by the diminution in the value of the accounts of the Offshore Fund and the other Receivership Funds and by the substantial losses that would not have continued in the accounts of the Offshore Fund had Man Financial, the Employee Defendants, Eustace and PAAMCo not acted as aforesaid.

165.    The activities of Man Financial, the Employee Defendants, Eustace and PAAMCo were conducted through a pattern of racketeering activity, which included numerous related acts of fraud, over the time averred in this Complaint, through the use of the United States Mail, including the mailing of account statements and performance reports, and interstate wires, including e-mails and telephone calls between and among the foregoing persons, in furtherance of purposes as alleged above, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, including, but not limited to, the following racketeering acts more specifically alleged above:

  a.    by use of the mail and wires, improperly opening the 10 Account and the 50 Account,

b.      by use of the mail and wires, causing the manipulating of information Man Financial provided to UBS concerning the trade execution dates for certain EFP transactions intended to bolster artificially profits or minimize losses for certain months in the 10 Account;

c.      by use of the mail and wires, causing the restriction of access to the 50 Account via the E-Midas system as a result of which UBS did not learn of the existence of the 50 Account;

d.      by use of the mail and wires, causing the making of fictitious trades in the 10 Account and the 50 Account to offset a substantial portion of a losing bond position in the 10 Account and to establish the long bond position in the 50 Account, which resulted in a loss of approximately $14 million being reflected in the 50 Account, rather than in the 10 Account;

e.      by use of the mail and wires, agreeing to a procedure whereby Man Financial transferred losing positions from the 10 Account to the 50 Account by canceling the trades in the 10 Account and moving them into the 50 Account to conceal losses in the 10 Account, and, in like manner, moving profitable positions from the 50 Account to the 10 Account to offset existing positions in the 10 Account;

f.      by use of the mail and wires, causing Man Financial to send e-mails to a potential investor in the Offshore Fund misrepresenting and grossly overstating the net value of the Offshore Fund;

- 43 -

g.      by use of the mail and wires, hiding the 50 Account from UBS, PAAMCo's Board of Directors and PAAMCo's employees; and

h.      by use of the mail and wires, sending of fictitious account statements to investors in the Receivership Funds.

166.    18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any provisions of subsections (a), (b), or (c) of this section.

167.    During the time alleged herein, Man Financial and the Employee Defendants conspired to violate 18 U.S.C. § 1962(c), in that they agreed to conduct the affairs of the association-in-fact enterprise so that the enterprise would earn incentive fees based on the purported profits as well as management fees based on the purported lawful operation of the Offshore Fund, and also agreed to conduct at least two of the alleged acts of racketeering activity alleged herein.

168.    During the time alleged herein, the aforementioned pattern of racketeering activity by Man Financial and the Employee Defendants caused the actual results of trading activities for the Offshore Fund to be hidden, to the direct and proximate harm of the Offshore Fund and the other Receivership Funds.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial and the Employee Defendants for compensatory damages, trebled, the costs of prosecuting this action, reasonable attorney's fees, and other such relief as the Court may deem appropriate.

# 469565  v. 1

## COUNT X

Deepening Insolvency Against Man Financial and the Employee Defendants

169.    Plaintiff incorporates by reference paragraphs 1 – 168 above as if set forth at length herein.

170.    Man Financial, as well as Gilmartin, Alavi, Wambach, Braun, Meyer, McMillan, Zamora and Rodriguez, through their knowing promotion and / or facilitation of the foregoing conduct of Eustace, acting individually and through PAAMCo, designed to hide, inflate or falsify the performance returns for the Offshore Fund, have expanded the debt of the Offshore Fund and artificially prolonged the corporate life of the Offshore Fund.

171.    As a proximate result of the Defendants' actions and inaction, the Offshore Fund and the other Receivership Funds have suffered injury to their businesses and property.

172.    Plaintiff seeks compensatory and punitive damages, costs and such other relief as the Court may deem just and proper.

WHEREFORE, Plaintiff, C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries and related entities, prays that judgment be entered in his favor and against Man Financial and the

# 469565  v. 1

Employee Defendants for compensatory damages, together with punitive damages, the costs of

prosecuting this action and other such relief as the Court may deem appropriate.

                                /s/ Lee A. Rosengard                           
                                Lee A. Rosengard
                                Michael J. Cordone
                                Nicholas Deenis
                                Leslie M. Greenspan
                                STRADLEY RONON STEVENS & YOUNG, LLP
                                2600 One Commerce Square
                                Philadelphia, PA  19103
                                (215) 564-8000 – phone
                                (215) 564-8120 – fax

                                Attorneys for C. Clark Hodgson, Jr.,
                                Receiver for Philadelphia Alternative
                                Asset Management Company, LLC and Its Partners,
                                Affiliates, Subsidiaries and Related Entities