## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN J. HARMELIN, RECEIVER AD LITEM | : | CIVIL ACTION |
| FOR PHILADELPHIA ALTERNATIVE ASSET | : | |
| MANAGEMENT COMPANY, LLC, AND ITS | : | |
| PARTNERS, AFFILIATES, SUBSIDIARIES AND | : | |
| RELATED ENTITIES, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| MAN FINANCIAL INC., THOMAS GILMARTIN, AND | : | NO. 06-1944 |
| UBS FUND SERVICES (CAYMAN) LTD. | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN WALLACE, EDWARD GOBORA, DAVID | : | |
| LASHBROOK and SCOTT SOMERVILLE, | : | |
| Third Party Defendants | : | |

## MEMORANDUM NO. 1 RE: SUMMARY JUDGMENT MOTIONS

Baylson, J.                                                      September 12, 2007

## I.      Introduction

This Memorandum will be the first of several to discuss various Motions for Summary

Judgment filed in this complex commodity trading case, charging fraud, negligence and other

claims.  As the Court, and perhaps counsel, have learned, commodities trading is a complex

business with its own rules, customs, statutes and enforcement agency.  Despite many facts being

in dispute, there is no dispute that fraud occurred – the issue is whether Defendants –  individuals

and entities –  (other than the"mastermind") are legally responsible.  This Memorandum will be

limited to discussion on the statute of limitations issue, claims under the Commodity Exchange

Act, and the claim of negligent supervision.

On June 22, 2005, the Commodity Futures Trading Commission ("CFTC") instituted an action in this district, Civil Action 05-2973, against Paul M. Eustace, (Eustace"), an individual, and an entity that he controlled, Philadelphia Alternative Asset Management Company, LLC ("PAAMCo"), seeking appointment of a receiver and other equitable relief arising out of the activities of Eustace and PAAMCo in creating a hedge fund known as the Philadelphia Alternative Asset Fund, referred to as the "Offshore Fund" in this litigation, leading to investor losses of almost $200,000,000.

Judge John Padova of this Court appointed C. Clark Hodgson, Esquire as Receiver, who immediately gathered together the known assets of PAAMCo and the Offshore Fund and took steps to stem any further losses.  Judge Padova's Order required a number of entities that had provided services to PAAMCo and/or the Offshore Fund to provide information, and one of those was Man Financial, Inc. ("Man"), a futures commission merchant, and as a result of which, a number of hearings were held before the undersigned (to whom the case was transferred) concerning its compliance with the Court's Orders.  Recently, a consent decree was entered against Eustace.

After a number of months, during which the CFTC and the Receiver conducted fact gathering, Mr. Hodgson sought and received permission from this Court to initiate litigation against Man, and filed the present case, Civil Action 06-1944.  Man moved to dismiss the Complaint, and the Court issued two Memoranda dealing with those issues on September 18, 2006 (Doc. No. 76) and October 5, 2006 (Doc. No. 92).[1]

_____

[1]Although denying Man's Motion to Dismiss, the Court concluded that because the Offshore Fund had  ratified certain actions taken by Eustace on its behalf, that the Receiver, "standing in the shoes" of the Offshore Fund, would be bound by those ratifications.

Upon answering the Complaint, Man added third party Defendants David Lashbrook and Scott Somerville, businessmen in the Cayman Islands who had served as directors of the Offshore Fund, and also Edward Gobora and John Wallace, employees of PAAMCo, operating in King of Prussia, Pennsylvania, within this district.  Subsequently, Man added UBS Fund Services (Cayman) Ltd. ("UBS") as an additional third party Defendant.  This Court denied various motions for dismissal by all the third party Defendants.

After extensive, intense, and somewhat expedited discovery, the Court entered a number of scheduling orders, which have resulted in the filing of voluminous summary judgment motions by both the Plaintiff and Man.  Further summary judgment motions are expected by the third party Defendants.

For the reasons stated in the Court's Memorandum of May 3, 2007 (Doc. No. 241), the Court appointed Stephen J. Harmelin, Esquire as Receiver Ad Litem for this case alone.  Mr. Harmelin subsequently determined to file an Amended Complaint in which both Man and UBS were named Defendants.  UBS has filed a Motion to Dismiss the Amended Complaint, which is being denied by a separate Memorandum and Order filed this date.

Man seeks summary judgment on all the claims against it in the Amended Complaint. Although Mr. Harmelin changed some of the factual allegations against Man, particularly concerning the involvement of UBS, the nature of the legal theories as to Man did not change.

Man also makes the following arguments in its Motion for Summary Judgment:

1.     Plaintiff's claims are barred because they accrued no later than May 8, 2005 (the Complaint having been filed on May 8, 2006), and a one-year statute applies pursuant to a contract between Man and the Offshore Fund.

2.      Plaintiff does not have sufficient facts to show proximate cause.

3.      Plaintiff's claims are barred by the doctrine of in pari delicto.

The Plaintiff seeks partial summary judgment on the following claims:

1.      Plaintiff is entitled to summary judgment against Man on the negligent supervision claim.

2.      Man is liable under the breach of contract claim.

3.      Any negligence of PAAMCo, UBS or the Offshore Fund, or those entities' employees, cannot be imputed to the Receiver Ad Litem.

Pursuant to the Court's practice order, the parties have filed extensive statements of undisputed facts, responses thereto and briefs.  The number of pages of pleadings and briefs on summary judgment total approximately 1,000, without including several cartons of exhibits.

## II.    Statement Of Facts

Through examination of the Defendants' Corrected Joint Statement of Undisputed Facts Submitted in Support of their Motion for Summary Judgment (Doc. No. 274), and Plaintiffs' Response (Doc. No. 335, tab 3), the Court states this summary of facts of the operation of PAAMCo, the Offshore Fund, and related parties, which will serve as an introduction to the determination of the various pending dispositive motions filed in this case.[2]

Eustace, who had prior investment business experience, was the major force in the operation of PAAMCo, a hedge fund management company and trading advisor, and has admitted fraudulent conduct in his depositions and in a Consent Decree in an enforcement action

---

[2]Man thereafter filed a document entitled "Compiled Undisputed Facts in Support of Defendant's Motion for Summary Judgment" (Doc. No. 365) in which it put together a compilation of Man's assertions and what it considered the Plaintiff's inadequate responses.

brought by the CFTC, Civil Action No. 05-2973, the result of which were huge losses for investors in PAAMCo.

PAAMCo was formed on July 22, 2002, and applied for registration with the National Futures Association ("NFA"), as a commodity trading advisor and commodity pool operator on September 10, 2003.  Eustace was the President of PAAMCo and the only principal of PAAMCo registered with the NFA.  On or about May 28, 2004, Eustace established Philadelphia Alternative Asset Fund, Ltd., (the "Offshore Fund") as a Cayman Islands corporation, to operate as a hedge fund and engage in speculative commodities futures and options trading.

Acting for PAAMCo, Eustace took steps to establish relationships with service providers. In June 2004, Eustace, on behalf of the Offshore Fund, established a business relationship with Man, registered with the NFA as a Future Commissions Merchant ("FCM"), which provides services to other FCMs and customers, including executing and clearing trades through the commodity futures markets and exchanges.

On behalf of the Offshore Fund, Eustace signed various agreements with Man, including a Customer Agreement, which is the operating contract for the relationship between the Offshore Fund and Man.  There are disputes as to how Eustace became a customer of Man, and whether Eustace was authorized to sign the agreements with Man which he executed on behalf of the Offshore Fund.  No party appears to have objected to the alleged signature defect during the time the agreement was in effect, prior to appointment of the Receiver.

Eustace had a prior relationship (the details of which are in dispute) with Thomas Gilmartin ("Gilmartin"), who joined Man on April 13, 2004 and became the Man employee most involved in the transactions which are the subject matter of this case.

Although there are a number of disputed facts about the extent to which Eustace and Gilmartin knew each other, and how much they knew about each other, these facts are not directly relevant on the legal issues presented; however, they may be very relevant as to credibility.  For example, unknown to Man, Gilmartin had invested various sums of money in ventures operated by Eustace, including PAAMCo, and had made profit on at least one of them. Gilmartin had primary responsibility for the Offshore Fund account.

Eustace retained UBS Fund Services (Cayman) ("UBS") to serve as the fund administrator for the Offshore Fund, which entered into an administration agreement with UBS dated July 29, 2004, which required UBS among other things to:

1.      Determine the Offshore Fund's net asset value once a month;

2.      Calculate the management and performance fees payable by the fund to the fund's investment advisor;

3.      Maintain the accounting records of the fund;

4.      Provide the fund, upon request, with any reports, accounting records and financial statements needed for audits;

5.      Process subscription agreements and redemption requests for the fund's investors.

The Offshore Fund had the following obligations:

> The Fund shall promptly supply to UBS all such information, documents, and instructions as are required by UBS to fulfill its obligations hereunder, and under any applicable legislation including, without limitation, the Mutual Funds Law and the PCCL.

A Cayman Islands entity, Maples Finance, Ltd. ("Maples"), secured Cayman Islands directors for entities such as the Offshore Fund, which were usually set up as investment funds

where the investors were located in the United States or other countries, but operated through the

Cayman Islands for regulatory and/or tax benefit reasons.  On June 15, 2004, Maples, at the

request of Eustace, arranged for third party Defendants David Lashbrook ("Lashbrook") and

Scott Somerville ("Somerville") to be appointed as directors of the Offshore Fund.

The registered office for the Offshore Fund was established as a result of an agreement

between the Offshore Fund and M&C Corporate Services Ltd. ("M&C") dated July 29, 2004.

The registered office address of the Offshore Fund was Ugland House, South Church Street, P.O.

Box 309, Georgetown, Grand Cayman, Cayman Island.  M&C agreed to forward to the Offshore

Fund all communications addressed to the Fund:

> MCCS shall use all reasonable endeavors to forward to the
> company all correspondence and other communications addressed
> to the company by such method as it considers appropriate in the
> context of relevant communications.  MCCS shall not be liable to
> the company for the late receipt by the company of any such
> correspondence and other communications which MCCS receives
> on behalf of the company from third parties.

This provision has taken on some significance in this litigation.  Man, as was its

contractual obligation, mailed its monthly statements to the registered office of the Offshore

Fund as stated above.  However, Lashbrook and Somerville, the Offshore Fund directors,

testified that the mail containing these statements would not be sent to them.  The envelopes

were forwarded unopened to PAAMCo, the trading advisor for the Offshore Fund.  A major

dispute arises over who bears responsibility for this and its consequences.

The Offshore Fund itself had entered into a Trading Advisory Agreement with PAAMCo

under which PAAMCo managed the Fund's commodity interest trading.  Although the Offshore

Fund granted PAAMCo specific authority to conduct all the Offshore Fund's trading activities,

the agreement also made it clear that PAAMCo, as trading advisor, had no authority to act for or represent the fund in any way and was not an agent of the fund.  Under the agreement, only the directors (Lashbrook and Somerville) had the power to open trading accounts.  Also under the agreement, PAAMCo agreed to reconcile all commodity positions of the Offshore Fund on a daily basis.

There is evidence that the Offshore Fund's directors, Lashbrook and Somerville, and its lawyers, Maples and Calder, all had actual knowledge of the accounts opened on behalf of the Offshore Fund at Man, the Customer Agreement between the Offshore Fund and Man, and that Eustace had opened the accounts and executed the Customer Agreement on behalf of the Offshore Fund.

When the Offshore Fund began its trading operations, the only accounts opened at Man were No. 159-15910, hereinafter called the "10" account, which operated as the Offshore Fund's primary trading account, and Account No. 159-15905 (the "cash account").  Man also opened a master account, Account No. 159-R5905, which netted on a daily basis all of the Offshore Fund sub-accounts.

On behalf of the Offshore Fund, UBS wire-transferred  $14.5 million in funds into the trading account of Man on or about July 2, 2004, and thereafter trading commenced at Eustace's direction.  See Fact Statement No. 53.

On March 1, 2005, Eustace directed Gilmartin to open another account, 159-15950 (the "50 account"), which event is described more fully in Man's factual statements 79-83.  Although Eustace gave Gilmartin certain reasons as to why he wanted this account, as the facts are developed, those reasons were false.  Eustace used the 50 account for most of his trading losses,

and attempted to keep its existence secret from others.  For example, Eustace did not authorize

UBS, which was to compute the net asset value of the Offshore Fund, to have electronic access to

the 50 account through e-MIDAS.  <u>See</u> Man fact statements paragraphs 79-83.

 The above narrative is a summary of facts that are either undisputed or a summary of

certain events that occurred.  It is important to note that Plaintiff and Man disagree significantly

on underlying details, such as whether Eustace has been truthful in the testimony that he has

given on the events in question, the relationship between Eustace and Gilmartin, and the

motivation of various individuals who played roles in this case.

## III. <u>The Parties' Contentions</u>

 Man's legal position is straightforward, that it complied with all of its contractual

obligations, that it, as much as any of the investors, was a victim of Eustace's fraud, and, as an

executing and clearing broker for the Offshore Fund, Man followed instructions and had no

knowledge or reason to believe that Eustace was acting fraudulently.  Man maintains that it

accurately made and fully reported all of the trades that Eustace instructed it to make, it provided

accurate account statements directly to its principal, the Offshore Fund, and therefore cannot be

held liable under any of the claims Plaintiff is asserting.

 Man asserts that it had no reason to believe that Eustace was committing any fraud, and in

any event, Man asserts that the accounts statements which it sent directly to the Offshore Fund

Directors Lashbrook and Somerville, for both the 10 and 50 accounts were accurate, and since no

complaints were timely made, are binding.  As noted above, Man asserts that because it complied

with its contractual obligations, Eustace's fraudulent manipulations are not its responsibility.

Man repeatedly asserts that since it sent the Offshore Fund accurate statements, the Offshore

Fund is bound by the account statements, and that UBS did not have knowledge of the 50 account only because Man followed Eustace's instruction concerning access to Man's e-MIDAS computer software program.

Man also asserts that the Receiver's claims are untimely, that it cannot be liable under the RICO and fraud claims because there is no evidence that it had any knowledge of fraud and once it can show, as it has shown, that it complied with its contractual obligations, it is entitled to be relieved of participation in this case.

The Receiver responds that the facts he has assembled after extensive discovery show that Man did not comply with all of its contractual obligations, that its employee, Gilmartin, who was in charge of the Offshore Fund account, was not adequately supervised by Man, that there were a number of improper activities in the setting up of various Man accounts, and given the activity in those accounts, Man is responsible under theories of respondeat superior because its other officers and employees, including Gilmartin, had knowledge of and/or enabled these activities, and therefore Man is responsible for the resulting losses.  The Plaintiff asserts that Man's reliance on its mailing of the statements is a red herring because it was clearly the intent of the parties that these statements would be e-mailed and the e-mails themselves contained incorrect information.

Man has instituted third party Complaints against the Offshore Fund directors, Lashbrook and Somerville, and also against two officers/employees of PAAMCo, Wallace and Gobora. This Memorandum does not concern the pending Motions for Summary Judgment by the third party Defendants, which have not been fully briefed, nor does it concern the allegations against UBS, which became a Defendant in the Amended Complaint relatively recently.

-10-

The Court is also aware that numerous expert opinions have been served and depositions of experts have been largely completed.  However, the Court does not believe that the resolution of the pending motions between Plaintiff and Man require consideration of any expert testimony.

## IV.   Summary of Factual Disputes

An important dispute arises out of the opening of the Offshore Fund's account at Man. Plaintiff asserts that Man should not have allowed Eustace to open this account because he did not have any specific relationship with the Offshore Fund itself, and that Man should have insisted that the account be opened by Lashbrook and Somerville as its directors.  Plaintiff points to a number of other irregularities and also whether Man's compliance department fulfilled its obligations.

The previous ruling that Plaintiff was bound to the terms of the customer agreement between Man and the Offshore Fund by reason of ratification, establishes the terms of the relationship between man and the Offshore Fund, but does not preclude Plaintiff from asserting irregularities, as fact issues that can be considered in determining whether the claims against Man, particularly non-contractual claims, such as fraud, require a trial.

Another event of significant dispute concerning trading on behalf of PAAMCo took place towards the end of October and beginning of November 2004.  Man claims that in connection with the calculation of the NAV for October 2004, PAAMCo advised UBS that the trade dates for certain trades in the Offshore Fund's account at Man were October 29, and not November 1, 2004, and suggested that the trades be backdated and included in the October NAV, thereby artificially increasing the NAV by $1.2 million and hiding losses.  There is no dispute about a discrepancy between the account statement Eustace sent to UBS and the account statement

available to UBS through Man's e-MIDAS system.  UBS relied on certain documents in making

the NAV calculations, including an e-mail of an account statement which Eustace testified to

falsifying.  A fact issue is whether UBS and/or Man should have known of these discrepancies

and should have then uncovered Eustace's fraud.  See Man's Statement of Facts, and Plaintiff's

Responses Nos. 68-74.  Man asserts these facts put Plaintiff on inquiry notice of the fraud and

started the running of the one-year statute of limitations.

Another major dispute centers on March 1, 2005 when Eustace directed Gilmartin to open

another account, No. 159-15950 (the "50 account").  The parties appear to agree that Eustace

opened this account so that he could put the Offshore Fund's losses into this account, which

losses Eustace admitted to concealing from investors and others.  Eustace admitted that he never

advised Gilmartin or anyone else at Man of the true reasons for establishing the 50 account.

Eustace stated he opened the 50 account to "move losses for a period of one or two days until

such time as the market recovered" and that this was intended to be temporary.

Much of the discovery in this case has been focused on the 50 account.  Plaintiff's brief,

pages 38-54, details significant facts which require a trial on issues such as whether Gilmartin

should have realized opening the 50 account would have resulted in investors being defrauded,

whether others at Man had become similarly knowledgeable, and whether Man is responsible,

perhaps along with others, for the resulting losses.

The parties also agree that Eustace manipulated information regarding trades from

January through June 2005, and UBS received information which distorted the dates on which

trades took place.  Eustace accumulated trading losses in the 50 account, but because that account

was not known by UBS, therefore the losses in the 50 account were not included in the Offshore

Fund's NAV calculated by UBS and reported to investors and others.

A major dispute revolves around the fact that UBS did not have e-MIDAS access to the 50 account. Man's factual statement, paragraphs 66-67, describe how the e-MIDAS system worked and cites very specific evidence that Eustace gave Man directions on who was to receive e-MIDAS notification, and that Man was not authorized to give it to anyone else.

Man's factual statement, paragraphs 122-32, also cites facts that support its contention that Eustace determined such access, and it is not responsible.  Plaintiff points to other facts showing that Man should not have honored Eustace's directions, such as the fact that UBS requested e-MIDAS access for all accounts, but Man did not provide it, contrary to its policy. These are factual issues of great import in this case because UBS's lack of knowledge of the 50 account was one obvious reason for UBS's reporting distorted fund valuations to investors. Plaintiff points out facts from which a jury could conclude Gilmartin, and possibly others at Man, knew of irregular trading and other actions contrary to standard practice involving the 10 and 50 accounts.  See Plaintiff's brief, pages 55-57.[3]

As noted above, PAAMCo was controlled by Eustace, the perpetrator of the fraud.  There is also substantial evidence to show that, for various reasons which may be relevant on the liability of other parties in this case, that Eustace effectively controlled the Offshore Fund, if only because other parties who may have had more direct responsibility over the Offshore Fund did not fulfill their responsibilities or exercise their power.  However, the Court need not further discuss these issues in this Memorandum.  The obvious discrepancies between Man's statement,

---

[3]The Court is aware of, but is not now considering, disputes as to other facts which, as alleged by Plaintiff, may make UBS legally responsible notwithstanding its lack of knowledge of the 50 account.

which included the 50 account, and the information received electronically by UBS, which did

not include the losses in the 50 account, were not uncovered until much later.  There are factual

issues, supported by evidence on both sides, as to whether the discrepancies should have been

uncovered earlier.  Once the monthly statements were forwarded from the Cayman Islands to

PAAMCo in the King of Prussia office, which was also Eustace's office, there are issues as to

whether there should have been further examination of the statements at that time and

comparison with the Offshore Fund values as calculated by UBS.  There is evidence that even a

cursory examination would have disclosed significant discrepancies.  Who, if anyone, bears

responsibility for such verification not being made cannot be ruled on as a matter of law.

Lashbrook and Somerville have testified that their understanding was that the standard

practice was to forward communications about funds such as the Offshore Fund to the

investment manager (PAAMCo).  Somerville testified that when the "registered office agreement

was executed, the address to which correspondence should be sent was left blank, and I was

aware that by doing that, MCCS would follow the policy of sending all communications and

documents received on behalf of the fund to the investment manager."  See Plaintiff's response

to fact statement 30.  The Plaintiff asserts that this testimony is consistent with Lashbrook and

Somerville's understanding that UBS was receiving account information from Man electronically

rather than in hard copy.

Considering the transfers that took place among the various accounts at Man, and whether

because of conversations between Eustace and Man employees, and among Man employees

themselves, a trial is necessary to determine if Man should have recognized that Eustace's

conduct was questionable, if not improper, and if further inquiry would have led to discovery of

fraud.

The above summary of certain disputes is just a summary, but it is clear that there are genuine issues of material fact. The parties' statements and counter-statements of facts,[4] and their briefs, contain a multitude of asserted omissions and misrepresentations by various parties, supported by voluminous documents and deposition transcripts.

The relationship between Eustace and Gilmartin, before Gilmartin became a Man employee, is subject to considerable disputes. Gilmartin had ownership interest in some ventures of Eustace and made a profit on at least one of them. Plaintiff has submitted evidence that it was the intent of Gilmartin and Eustace that Gilmartin would have an ownership stake in PAAMCo itself in exchange for an initial investment of $10,000. Gilmartin later redeemed his interest in PAAMCo for a substantial profit, after he had become a Man employee, but he did not disclose this fact to Man. Eustace has asserted throughout his testimony that he never told Gilmartin of the improper activities in which he was engaged in his trading for the Offshore Fund, and that Gilmartin was duped as much as anyone else. Plaintiff disputes the credibility of Eustace's testimony about Gilmartin, but has not come forward with any specific evidence on the summary

---

[4]The statements and counter-statements of the assertedly undisputed facts have been very helpful, but must be considered in context. Man's statement number 116 provides an example. As an initial statement, paragraph 116 merely recites language in the customer agreement between Man and the Offshore Fund, noting Man's obligation to send written notifications and the obligation of the customer to report differences "immediately," the failure of which will be deemed an agreement that the statement is correct and ratified. In Plaintiff's response to paragraph 116 (an many other similar assertions), Plaintiff admits that this language is in the agreement, but then asserts that the customer agreement is not determinative since Eustace signed it as purported President of the Offshore Fund, a position which he did not hold, and that the parties understood account information will be sent electronically. Man asserts that because Plaintiff's response about the electronic statement in Plaintiff's paragraph 116 does not bear a citation to the record, Man's facts are therefore undisputed. However, such citations do appear in other paragraphs. See Plaintiff's responses to assertedly undisputed facts at paragraphs 59-67.

judgment proceedings that Eustace's testimony was false.  Man emphasizes this lack of evidence, and implies that the Court should therefore accept Eustace's testimony on this point as a "undisputed fact" that must be given weight in the summary judgment context.

The Court rejects this argument because even though there is no direct evidence contrary to Eustace's testimony about Gilmartin's knowledge (or lack thereof), there is significant and substantial evidence in the record from which a jury could find that Eustace was not being truthful.  First, his conduct was fraudulent, if not felonious, and for these reasons alone, a jury may not believe Eustace.  One of the circumstances that might lead a jury to this conclusion is the prior dealings with each other, and another legal reason is that, in a fraud case when the credibility of the pivotal figure in the fraud, here Eustace, is so key to an understanding into the machinations in which he engaged, it would be improper to take away from the jury its own assessment of Eustace's credibility in the context of all the other evidence.  Disputing an individual's credibility for Rule 56 purposes requires less specificty than disputing an objective fact, such as who signed a document.  There are also numerous facts in the summary judgment record showing that Gilmartin had reason to know that some of Eustace's activities were not appropriate, and there are a number of instances in which Eustace asked Gilmartin to conduct trades and make records that Gilmartin knew or should have known were at least technically, if not plainly, in violation of the rules governing the conduct of FCMs in commodity trading.

## V.    Statute of Limitations

Man contends that Plaintiff's claims are time barred by the one-year limitations period

contained in the Customer Agreement between PAAMCo and Man.[5]  According to Man, the

Offshore Fund was on inquiry notice of its claims against Man by, at the very latest, April 8,

2005, yet the Receiver did not file suit against Man until May 8, 2006, one month after the

limitations period expired.  Plaintiff asserts that its claims are timely because the statute of

limitations was tolled by the "adverse domination" doctrine until the Fund was placed into

receivership on June 23, 2005, at which point the Court affirmatively barred the Receiver from

filing any lawsuits until April 28, 2006.

Generally, if a federal court applies a state limitations period, it should also apply state

tolling principles.  In re Mushroom Transp. Co., Inc., 382 F.3d 325, 335 (3d Cir. 2004); see

also Vernau v. Vic's Market, Inc., 896 F.2d 43, 45 (3d Cir. 1990) ("[S]tate tolling principles are

generally to be used by a federal court when it is applying a state limitations period.").  In this

case, the Court is applying a limitations period set by contract, not by state or federal law.

However, state law supplies the "principles by which the one-year period set by contract must be

assessed," and therefore the Court will look to state law for any relevant tolling principles.

Cange v. Stotler & Co., Inc., 826 F.2d 581, 598 (7th Cir. 1987) (Easterbrook, J., concurring).  In

this case, there is no relevant conflict between the laws of Pennsylvania and Illinois,[6] and the

Court will refer to them interchangeably.  See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230

(3d Cir. 2007) ("If two jurisdictions' laws are the same, then there is no conflict at all, and a

choice of law analysis is unnecessary.").

---

[5]Plaintiff does not contest the applicability of the contractual limitations period to its
claims against Man.

[6] Although the Customer Agreement applies Illinois law, the law of the forum state,
Pennsylvania, is also potentially applicable.

A.     **Accrual of Plaintiff's Claims Under the Discovery Rule**

_____Generally, a cause of action "accrues" (i.e., the statute of limitations begins to run) when

the plaintiff is injured.  Both Illinois and Pennsylvania apply an exception known as the

"discovery rule" when a party, who has not suffered an immediately ascertainable injury, is

reasonably unaware he has been injured.  Under the discovery rule, a claim accrues when a party

knows, or using reasonable diligence should know, he has been injured and the injury was

wrongfully caused.  Knox Coll. v. Celotex Corp., 430 N.E.2d 976, 980 (Ill. 1981).  In defining

"reasonable diligence," the Pennsylvania Supreme Court has observed:

> There are very few facts which diligence cannot discover, but there must be some
> reason to awaken inquiry and direct diligence in the channel in which it would be
> successful.

Vernau, 896 F.2d at 46 (quoting Deemer v. Weaver, 187 A. 215, 217 (Pa. 1936)).  Whether a

party should have known of his injury by exercising reasonable diligence is a factual

determination, and should "ordinarily" be resolved by a jury.  Fine v. Checcio, 870 A.2d 850,

858 (Pa. 2005); accord Clay v. Kuhl, 727 N.E.2d 217, 221 (Ill. 2000) ("The issue whether an

action was brought within the time allowed by the discovery rule is generally resolved as a

question of fact.").[7]

       Both Man and the Receiver agree that the discovery rule applies in this case and should

---

       [7] Although state law governs Plaintiff's common law claims, federal law determines the
accrual date of the CEA and RICO claims.  See PaineWebber Inc. v. Faragalli, 61 F.3d 1063,
1066-67 (3d Cir. 1995) ("[F]ederal, not state, law governs as to when the [federal] cause of
action accrues.").  The discovery rule also applies under federal law.  See Dyer v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., 928 F.2d 238, 240 (7th Cir. 1991) ("The proper standard for
determining the commencement of the limitations period [for a CEA claim] is when the plaintiff
knew or in the exercise of reasonable diligence should have known of defendant's alleged
misconduct."); Forbes v. Eagleson, 228 F.3d 471, 494 (3d Cir. 2000) (adopting the "injury
discovery" rule to determine when a RICO action accrues).

determine when the Receiver's claims accrued.  Man posits two potential accrual dates:

(1) November 8, 2004 and (2) April 8, 2005.  According to Man, if UBS had exercised

reasonable diligence, it would have checked the accuracy of the account statements provided by

PAAMCo before issuing the inflated October NAV, and would have discovered a clear

discrepancy in trade dates.  This would have put UBS (and by extension, the Offshore Fund) on

inquiry notice of the existence of a claim.  Alternatively, if the Fund's directors had exercised

reasonable diligence and opened the monthly statements for the sub-accounts which Man mailed

to the Cayman Islands, they would have learned of the ongoing misconduct by no later than April

8, 2005.  The Receiver claims these events simply raise issues of fact that Man is entitled to

present to a jury, but do not establish that the Fund should have known of the wrongdoing as a

matter of law for statute of limitations purposes.

   After carefully reviewing the record, the Court agrees with Plaintiff that the date on

which the Fund should have discovered its claims against Man is a disputed issue of fact that

cannot be resolved on a motion for summary judgment.  This Court cannot say as a matter of law

that it was unreasonable for the directors not to open the mailed financial statements, when there

is ample evidence in the record that electronic statements were the preferred mode of accessing

account information, and both Man and UBS regularly monitored the Fund's investments using

e-MIDAS.

   The cases Man relies on for the proposition that investors are on inquiry notice of the

contents of their account statements are readily distinguishable from the case at hand.  See Man's

Mot. for Summ. J. 18 (citing Koke v. Stifel, Nicolaus & Co., Inc., 620 F.2d 1340 (8th Cir. 1980);

Appel v. Kidder, Peabody & Co. Inc., 628 F.Supp. 153 (S.D.N.Y. 1986)).  In both Koke and

*Appel*, the monthly statements served as the investors' principal source of information regarding their accounts, yet the investors failed to read them because they did not understand them or were too busy.  See also Ebrahimi v. E.F. Hutton & Co., Inc., 852 F.2d 516, 523 (10th Cir. 1988) (investor was on inquiry notice of unauthorized trading where he failed to review "the primary source of information concerning [his] accounts" for several years).  Moreover, the defendants in those cases never attempted to conceal their wrongdoings, but rather provided the investors with accurate information about the trading activity in their accounts which the investors simply failed to consult.  See Appel, 628 F.Supp. at 157 ("Plaintiffs do not contend that the churning [of the pension trust account] was conducted in a secretive fashion.").  In this case, by contrast, there is substantial evidence that the NAV statements prepared by UBS Cayman were the directors' main source of information, and that Eustace actively worked to ensure the trading losses were not readily discoverable.  Under these circumstances, the Court cannot find as a matter of law that Plaintiff's claims accrued on either November 8, 2004 or April 8, 2005.

**B.    Litigation Stay by the Court**

Even if the Court adopted the earliest accrual date posited by Man (November 8, 2004), the Receiver's claims would be timely because the limitations period was tolled from June 23, 2005 (when the Receiver was appointed) until April 28, 2006 (when the Court authorized the Receiver to file a complaint against Man).  Although Man contends there was no order "staying" this litigation, the record is replete with evidence that the Receiver was not free to pursue claims against Man until the CFTC completed its investigation, and the Court authorized the Receiver to file third party actions.

From the beginning of the government's investigation, the Court sought to avoid

-20-

duplication of efforts by the CFTC and Receiver.  To this end, the Court ordered the CFTC to

determine what work the CFTC and its counsel could perform so that "same or similar work"

would not be performed by the Receiver and its counsel, and recoverable assets would be

conserved.  CFTC v. Eustace, et al., No. 05-2973, Order, Nov. 10, 2005 (Doc. No. 86).  At a

pretrial conference in December 2005, there was "substantial discussion . . . about the allocation

of responsibility" between the CFTC and Receiver, and the Court ordered the CFTC to "take the

lead in obtaining and reviewing" documents provided by Man, and give the "fruits of [its] work"

to the Receiver "for review in terms of . . . potential claims against third parties."  CFTC v.

Eustace, et al., No. 05-2973, 2005 WL 3725003, at *1-2 (E.D. Pa. Dec. 29, 2005); Order, Dec.

29, 2005 (Doc. No. 117).  If the CFTC "fail[ed] to 'step up to the plate' in getting its job done,"

the Court would then give the Receiver "unbridled authorization to move ahead in any areas in

which the CFTC had not met the Court's expectations."  Id. at *2.

Additionally, if the CFTC did not seek restitution from third parties for violations of the

CEA or Commission's Regulations by March 16, 2006, the Receiver could seek authorization

from the Court to file such actions.  See CFTC v. Eustace, et al., No. 05-2973, Order, Dec. 29,

2005, ¶ 16 (Doc. No. 117).  The Receiver was also required to notify the Court at that time of any

third parties that may be subject to "other potential damage claims not duplicative of any claims

brought by [the CFTC]."  Id.[8]  On April 17, 2006, the CFTC advised the Court that, to date, it

had taken no action against third parties, but would notify the Court if it later decided to do so.

The Receiver promptly sought authorization from the Court to bring claims against Man, which

---

[8] The Court later extended this deadline to April 17, 2006.  See  CFTC v. Eustace, et al.,
No. 05-2973, Order, Mar. 28, 2006 (Doc. No. 205).

the Court granted on April 28, 2006.  See CFTC v. Eustace, et al., No. 05-2973, Order, Apr. 28, 2006, (Doc. No. 217).

Although no single court order specifically tolled the statute of limitations, the above recitation of events clearly demonstrates that the Receiver was not allowed to pursue claims against third parties until the CFTC determined what causes of action it intended to bring.  This was the clear understanding of the parties and this Court.  Accordingly, the Court finds the limitations period was tolled between June 23, 2005 and April 28, 2006, and Plaintiff's claims are timely under either of the accrual dates proposed by Man.

**C.   Fraudulent Concealment**

The doctrine of equitable estoppel, and more specifically fraudulent concealment, may also apply to toll the statute of limitations until the Receiver was appointed in June 2005.  Because the Court has already determined there are disputed issues of fact with respect to when Plaintiff's claims accrued, there is no need to resolve this issue at this stage of the proceedings.  Nonetheless, the Court will briefly discuss the case law in this area because there are material issues of fact concerning Man's knowledge of the facts which a jury may find sufficient to establish fraud under the CEA.  See infra Part V.A.

Equitable estoppel is the "umbrella" concept which prevents a defendant from asserting the statute of limitations as a defense if his conduct has induced another to forebear bringing suit within the limitations period.  Cange v. Stotler & Co., Inc., 826 F.2d 581, 586 (7th Cir. 1987).  For example, if a defendant lulls plaintiff into a false sense of security by promising not to plead the limitations period as a defense, the Court may later equitably estop him from claiming that plaintiff's action was untimely.  Fraudulent concealment is one "instantiation" of equitable

estoppel, and requires that a plaintiff "show affirmative acts or representations by defendants which were designed to prevent and, in fact, did prevent, plaintiff from discovering his claim." Shropshear v. Corp. Counsel of the City of Chicago, 275 F.3d 593, 597 (7th Cir. 2001); Gredell v. Wyeth Lab., Inc., 803 N.E.2d 541, 548 (Ill. App. Ct. 2004); accord Fine, 870 A.2d at 860 (fraudulent concealment is "based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts").  Illinois has codified its doctrine of fraudulent concealment, and allows a plaintiff to sue within five years after he discovers his cause of action.  See 735 Ill. Comp. Stat. 5/13-215.  However, in both Illinois and Pennsylvania, a plaintiff's lack of due diligence is a valid defense to fraudulent concealment. See Shropshear, 275 F.3d at 595 ("The Illinois cases also require due diligence by the plaintiff who charges fraudulent concealment."); Fine, 870 A.2d at 861 ("[T]he standard of reasonable diligence . . . also should apply when tolling takes place under the doctrine of fraudulent concealment.").

        The case law carefully distinguishes between fraud that forms the basis of the underlying action, and fraudulent acts "above and beyond the wrongdoing upon which the plaintiff's claim is founded[,] to prevent the plaintiff from suing in time."  Cada v. Baxter Healthcare Corp., 920 F.2d 446, 451 (7th Cir. 1990).  The fraudulent acts that are implicit in committing the fraud in the first place do not constitute fraudulent concealment.  Acts of concealment that are part of the original fraud merely "postpone the date of accrual" because they prevent the plaintiff from discovering he is a victim of a fraud, and are thus "within the domain of the discovery rule."  Id. In order for fraudulent concealment to toll the limitations period, the defendant must make

additional efforts to conceal the cause of action from potential plaintiffs and prevent them from

suing in time.  Id.; accord Turner v. Nama, 689 N.E.2d 303, 309 (Ill. App. Ct. 1997)

("[F]raudulent misrepresentations which constitute the basis of the claim do not amount to

fraudulent concealment unless these actions tended to conceal the cause of action.") (internal

quotations omitted).  For example, paying kickbacks to trustees constitutes fraud; using dummy

corporations to make it difficult for anyone to discover the kickbacks qualifies as fraudulent

concealment.  Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1103 (7th Cir. 1992)

(Posner, J., concurring).

   For the reasons noted above, the Court does not have to decide whether the Plaintiff's

evidence as to Man's alleged acts of fraud (which, as discussed below, are sufficient to survive a

motion for summary judgment on the CEA claim) qualify as concealment for tolling purposes, or

whether Lashbrook and Somerville exercised sufficient diligence to warrant application of this

equitable doctrine.[9]

---

[9] Both parties devoted considerable space in their briefs to the issue of "adverse
domination" - an equitable doctrine which tolls the statute of limitations during the period when
a plaintiff corporation is controlled or dominated by wrongdoers.  The rationale is that culpable
officers or directors cannot be expected to challenge their own actions while they are still in
control.  Thus, only when a new entity takes control (e.g., a receiver or new board of directors)
can suit against the wrongdoers be brought as a practical matter.  As explained below, the
adverse domination doctrine may not fit this scenario, but for the reasons stated in the text, the
Court does not need to resolve this issue at this stage.
      There are two basic variations of the adverse domination doctrine: the majority test and
complete domination test.  Under the majority test, plaintiff must show that a majority of board
members were wrongdoers during the period plaintiff seeks to toll the statute of limitations.  The
complete domination test requires plaintiff to demonstrate that the officers/directors charged with
wrongdoing exercised full, complete and exclusive control over the corporation (although they
may not necessarily have constituted a majority).  See Lease Resolution Corp. v. Larney, 719
N.E.2d 165, 171-72 (Ill. App. Ct. 1999).
      The Illinois Court of Appeals has expressly adopted the "majority" version of the adverse
domination doctrine.  Id. at 172 ("We expressly adopt the adverse domination doctrine and hold

that in order to avail itself of the doctrine a plaintiff must establish that a majority of the directors were wrongdoers during the period the plaintiff seeks to toll the statute, in that they exhibited at least recklessness or gross negligence."). Pennsylvania has yet to expressly adopt either version, but in Resolution Trust Corp. v. Farmer, 865 F.Supp. 1143 (E.D. Pa. 1994), then-District Judge Rendell predicted that the Pennsylvania Supreme Court would apply the "complete domination" test in an appropriate case. Under this formulation, plaintiff must negate the possibility that an informed shareholder or director could have induced the corporation to initiate suit. Judge Rendell noted that the complete domination test provides for a "broader range of possibilities" than the "majority test" when, for example, a single "truly dominant officer" controls all of a corporation's affairs. Id. at 1158 n.14.

Man contends that the adverse domination doctrine is inapplicable because: (1) Man is a third party, not an officer or director of the Fund; and (2) Eustace, the alleged wrongdoer, was also not an officer or director of the Fund. Although in most adverse domination cases, the defendants are the former officers/directors of the corporation, in Lease Resolution, the Appellate Court of Illinois specifically observed that "the fact that two of the defendants . . . were not members of the Board does not automatically render the adverse domination doctrine inapplicable." 719 N.E.2d at 172. Rather, the doctrine applies to toll the limitations period for a cause of action by a corporation "against a non-board member co-conspirator of the wrongdoing board members." Id. (emphasis added). Although in Lease Resolution, the board members were also defendants, a number of courts have applied the adverse domination doctrine in cases where the only named defendants were third parties. See, e.g., Rosner v. Emperor Int'l Exch. Co., No. 95-10906, 1998 WL 255437 (S.D.N.Y. May 20, 1998) (applying adverse domination doctrine in CEA action brought by a receiver against Emperor, an outside dealer used by futures commissions merchant to make fraudulent trades); Warfield v. Carnie, No. 04-633, 2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) (applying doctrine in an action brought by a receiver of a Ponzi scheme against third parties who facilitated investments in the scheme, or received transfers or false profits from the receivership entities); Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873 (9th Cir. 1984) (recognizing applicability of doctrine in a suit against auditor of bankrupt corporation). Thus, contrary to Man's assertions, the fact that Man was not an officer/director of the Fund would not preclude application of the adverse domination doctrine.

Man's second argument (i.e., that Eustace could not have dominated the Fund for adverse domination purposes because he was not an officer or director) has more weight. In all the adverse domination cases this Court has reviewed, the primary "wrongdoers" are the officers or directors of the plaintiff corporation. In fact, Illinois' formulation of the test explicitly requires a plaintiff to show that a majority of board members were culpable. This comports with the underlying rationale of the doctrine, that a corporation cannot be expected to take legal action against itself if the board is controlled by wrongdoers. The Court has not found (nor have the parties cited) any case employing the adverse domination doctrine where an agent of the plaintiff corporation (like Eustace) effectively controls the corporation. Applying the doctrine to this set of facts may, in the Court's view, unnecessarily expand it.

D.    **Conclusion**

In sum, the Court has found material issues of fact as to the accrual of Plaintiff's claims under the discovery rule, and is unable to say as a matter of law when Lashbrook and Somerville should have known the Fund was "wrongfully injured."  However, even applying the earliest accrual date posited by Man (November 8, 2004), the Receiver's claims are timely because the limitations period was tolled from June 23, 2005 (when the Receiver was appointed) until April 28, 2006 (when the Court authorized the Receiver to file a complaint against Man).  The Receiver filed suit on May 8, 2006, well within the one-year contractual limitations period established by the Customer Agreement.  Although the tolling doctrines of fraudulent concealment and adverse domination are potentially applicable, there is no need to resolve these issues at this point.

VI.    **Commodity Exchange Act Claims**

A.    **Direct Violation of the CEA**

In Count V of the Second Amended Complaint, the Receiver alleges that Man violated the anti-fraud provisions of the Commodity Exchange Act ("CEA"), §§ 4b(a) and 4c(b), 7 U.S.C. §§ 6b(a)(2)(I)-(iii) and 6c(b), and the regulations promulgated thereunder, 7 C.F.R. § 33.10(a)-(c).  These provisions make it unlawful for a person to willfully engage in fraudulent conduct in connection with an order to buy or sell a commodities future contract or an option contract thereon.  CFTC v. Am. Metal. Exh. Corp., 693 F.Supp. 168, 193 (D.N.J.1988).

Man argues that the Receiver's claims for fraud the CEA should be dismissed because Man did not make any actionable misrepresentations or omissions to the Offshore Fund.  Instead,

-26-

Man contends it satisfied its contractual reporting duties by providing accurate account statements to both the Offshore Fund and PAAMCo. Further, Man claims that this full disclosure negates any claim that it intended to defraud either the Offshore Fund or PAAMCo. The Receiver counters that the evidence shows that Man violated the CEA's anti-fraud provisions. This Court discussed the legal standards governing a claim under the CEA at length in its October 5, 2006 opinion denying Man's Motion to Dismiss the Receiver's claims under the CEA. For that reason, the Court will not discuss these provisions at great length and will instead address the factual issues raised by the parties in light of the summary judgment standard governing this motion.

### 1.    Elements of Common Law Fraud

In addition to showing the fraudulent conduct was committed in connection with a futures contract or an option thereon, a plaintiff alleging a violation of the CEA must show that the elements of common law fraud are present. As the Court discussed in its earlier opinion, these elements are a (1) false representation of a material fact; (2) made with knowledge of its falsity; (3) with intent to induce the plaintiff to rely on it; and (4) reliance on that false representation. CFTC v. Rosenberg, 85 F. Supp. 2d 424, 447 (D.N.J. 2000). Further, a plaintiff must prove that injury was caused by the plaintiff's reliance on that false representation. Id.; Horn v. Ray E. Friedman & Co., 776 F.2d 777, 780 (8th Cir. 1985).

Although Man contends that the Receiver must establish each of these elements by clear and convincing evidence, the burden of proof on the Receiver is more appropriately that he must prove each element by a preponderance of the evidence. There is no Third Circuit precedent. See CFTC  v. Risk Capital Trading Group, Inc., 452 F. Supp. 2d 1229, 1244 (N.D. Ga. 2006)

(noting that neither statutory nor case law is clear on what burden of proof applies to a claim brought under the CEA, but deciding to apply a preponderance standard in accord with the parties' agreement).   The cases relied upon by Man Financial hold generally that a heightened burden of proof should be applied in civil fraud cases, but none of these cases address the standard applied to a fraud claim under the CEA.   See Vandervelde v. Espy, 908 F. Supp. 11, 16 (D.D.C. 1995) (finding burden of proof applicable in scheme to defraud Dairy Termination Program is clear and convincing evidence); Graham v. Renbrook Sch., 692 F. Supp. 102, 107 (D. Conn. 1988) (applying clear and convincing evidence standard to plaintiff's burden to prove pretext in age discrimination case because of similarities of pretext claim to one for common law fraud); Seanto Exports v. United Arab Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001) (noting, under federal law and New York common law, plaintiff must prove the elements of fraud by clear and convincing evidence).   In fact, the Supreme Court reversed an appeals court for applying a clear and convincing evidence standard to a fraud claim brought under § 10(b) of the Securities and Exchange Act.   The appeals court had relied on the heightened burden of proof applied to claims of common law fraud in deciding to use a clear and convincing evidence standard.   The Supreme Court rejected this rationale, noting that the historical considerations underlying that heightened burden were inapplicable to the securities context, and instead held that the governing standard was the preponderance of the evidence standard generally employed in civil actions.   See Herman & MacLean v. Huddleston, 459 U.S. 375, 390-391 (1983).

### a.   Man's Misrepresentation or Omissions of Material Fact

Man argues that the Receiver has been unable to produce any proof that Man ever made misrepresentations or omissions to the Offshore Fund itself.   Instead, the alleged

misrepresentations were made to UBS, the Offshore Fund's administrator.  Since Man was

contractually obligated only to provide account statements to its customers, PAAMCo and the

Offshore Fund, and had no statutory obligation to provide account information through its

electronic system, the accurate account statements it mailed to the Offshore Fund, which were

then forwarded to PAAMCo, obviated it of any responsibility for the numerous

misrepresentations or omissions the Receiver alleges were made (or not made) to UBS through

the e-MIDAS system.  Further, Man notes that, because Eustace did not authorize UBS to have

electronic access to the 50 account, Man lacked the authority to provide that access.

        Man relies in part on two district court opinions from the Southern District of New York

in the action of Kolbeck v. LIT America, to support its position that it had a statutory duty to

honor its customers requests.  See Kolbeck v. LIT Am., Inc., 923 F. Supp. 557 (S.D.N.Y. 1996)

("Kolbeck I"); Kolbeck v. LIT Am., Inc., 939 F. Supp. 240 (S.D.N.Y. 1996) ("Kolbeck II"),

aff'd. 152 F.3d 918 (2d Cir. 1998).  In Kolbeck, the issue was whether a group of investors who

had been defrauded by an unregistered commodities trader could bring claims under the CEA

against the futures commissions merchants ("FCMs") that had managed accounts for the trader.

The Court agrees with the general proposition that an FCM is obligated to comply with the

requests of its customers with respect to that customer's accounts, see Kolbeck II, 939 F. Supp. at

248.  If the facts would allow the jury to find the FCM itself, knowing of its customers' efforts to

misstate the value of its account, either knowingly ignored those efforts in making its reports, or

actively assisted in the perpetration of the fraud, it cannot rely on the instructions of the client to

absolve it of liability.

        The Court concludes that the factual disputes summarized above, which are detailed to a

much greater extent in the parties' statements and counter-statements of facts, and in the briefs,
would allow a jury to find that Gilmartin had motivation to assist Eustace in using Man's
facilities to perpetuate the fraud.  Although the evidence is sketchy as to whether Gilmartin had
specific knowledge of any details of Eustace's scheme, he had enough information from the
manufactured e-mails, and the requests for ignoring Man's rules and regulations on a number of
instances, to allow a jury to infer scienter.  There is evidence that other individuals at Man also
were aware that Gilmartin's conduct was not in accordance with either Man's regulations or
Commodity Exchange regulations.  If a jury finds Man's employees possessed this knowledge,
the jury may also find that Man is responsible for this conduct with such knowledge, or that Man
did not take steps it was obliged to take.  Therefore, the Court cannot grant summary judgment to
Man on the Commodity Exchange Act claims against it.  Taking Man's formalistic argument to
its logical conclusion would require this Court to hold that Man is absolved of committing a
knowing fraud simply because that fraud was perpetrated pursuant to its customer's instructions.
This is a proposition with which this Court cannot agree.

The facts underlying Kolbeck only serve to highlight this distinction.  In Kolbeck, the
CFTC had brought an action against the unregistered trader and his companies whose illegal
activities had led investors in his companies to sustain significant losses.  Kolbeck I, 923 F.
Supp. at 562-63.  The court granted summary judgment to the CFTC on a number of its CEA
claims, permanently enjoined the trader and his companies from engaging in the prohibited
conduct and froze their assets.  The court then appointed a receiver to manage those assets.  The
receiver in Kolbeck subsequently issued a report on the status of those assets.  He concluded it
would be unlikely that he would be able to obtain further assets because he was " not aware of

-30-

any facts that would support a good faith claim on behalf of [the trader and his companies] against [the futures commodities merchants] or individuals or anyone else." Id. at 563. Accordingly, he declined to bring an action against the FCMs that had executed trades on behalf of the trader and his companies.  Here, by contrast, the Receiver brought an action against the FCM and has cited a number of facts that support his conclusion that Man may be legally responsible for the fraud that occurred in this case.

Further, as this Court noted in its earlier decision, the relationship between the Offshore Fund and UBS, and the extent to which the Offshore Fund relied exclusively on the reports of UBS, as opposed to the statements mailed to the Fund's designated office, is an issue of fact.  The facts outlined by the Receiver suggest that UBS acted as an agent for the Offshore Fund.  Man concedes, under principles of agency law, misstatements made to an agent may be indirectly relied upon by the principal in asserting a claim for fraud.  As the Receiver points out, UBS relied on the information provided by Man to calculate the NAV of the Offshore Fund, and the Offshore Fund, in turn, relied on that calculation is assessing the Fund's performance. As a result, any intentional misrepresentations or omissions with respect to UBS would lead to deception of the Offshore Fund and its investors.

Man nonetheless contends that, regardless of whether UBS was the Offshore Fund's agent, the Offshore Fund could not claim indirect reliance because both the Offshore Fund and PAAMCo knew, or should have known, about the 50 account and the transactions in that account.  The Receiver responds that the evidence amply supports its contention that Man or its employees misrepresented or omitted material facts to the Offshore Fund, its investors, PAAMCo employees or UBS Cayman.

Man cites In re Rubin Bros. Footwear, Inc. for the proposition that the element of reliance in a claim for fraud cannot be met  "[w]here the plaintiff has complete and full knowledge of the facts."  119 B.R. 416, 424 (S.D.N.Y. 1990).  In Rubin, the plaintiff argued that the defendant defrauded the plaintiff's creditors by entering into a refinancing plan with the plaintiff.   Noting that the evidence was not in dispute that the plaintiff was fully aware of the refinancing plan and its consequences, the court rejected this argument.  Id. at 425.  Man also relies on a district court case from the District of Colorado where the court held that an insurer could not bring counterclaim for fraud based on misrepresentations made by the defendant to the insurer's policyholders about the financial stability of the insurer and the nature of its business practices. Saine v. A.I.A., Inc., 582 F. Supp. 1299, 1308-09 (D. Colo. 1984).  The court observed that the misrepresentations made to the policyholders "related to facts particularly within [the insurer's knowledge]," and found that the insurer "could not have been ignorant of the falsity of the statements."  Id. at 1309.  Consequently, the court held that the insurer could not have relied on these statements and, even if it had, had no right to do so.

Neither Rubin nor Saine dealt with facts analogous to those at issue here.  At the time of the fraudulent acts alleged in this case, the evidence suggests that Eustace controlled PAAMCo and had set in motion a series of events that made it problematical, at least as far as Man's liability is concerned, that the Offshore Fund, as the entity which was Man's customer, may have discovered the fraud.  Thus, although Eustace did not actually have the authority to control the Offshore Fund, a jury might find that he effectively directed the events that enabled the fraud to succeed.  This is an example of where Man's alleged overlooking of some of the defects in the opening of the account are relevant and may be persuasive to a jury.  If Man had rejected the

Offshore Fund's opening of the account because it was not signed properly, this may have been a factor preventing the fraud from taking place.  The Court does not subscribe to any argument that Man can be liable under a "but for" theory of liability, but only notes that in the complex commercial relationships that exist in this case, a fact which alone may be insignificant, when taken together with other facts, may contribute to a jury's finding of liability.[10]

**VII.**   **Plaintiff's Motion for Summary Judgment or Negligent Supervision Claim**

The Court has carefully reviewed the Plaintiff's Motion for Summary Judgment in which the Plaintiff asserts that the Court should find as a matter of law that Man is liable to Plaintiff on the negligence supervision claim and on the breach of contract claim, and that any negligence of PAAMCo, UBS or the Offshore Fund cannot be imputed to Plaintiff.  At this point, the Court is comfortable in ruling that a claim of negligent supervision necessitates a submission of the facts as to fulfilling a duty of care to a jury for its determination as to what is reasonable.  This is a claim in which the Plaintiff bears the burden of proof and the Court cannot substitute its legal conclusions for the Plaintiff's obligation to prove to a jury that some reasonable standard of care was violated. See Cody v. Sherwin Williams, 975 F. Supp. 639 (D.N.J. 1997) (applying New Jersey law which is similar to Pennsylvania law as to negligence).

An appropriate Order follows.

---

[10]Man's reply brief made many arguments, as to all of Plaintiff's claims, that Plaintiff cannot prove reasonable reliance or proximate causation.  Because of these same reasons, i.e., the interwoven relations of the parties, each performing different functions, in complex commercial transactions, the Court cannot ignore disputed fact issues on these doctrines.

-33-

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN J. HARMELIN, RECEIVER AD LITEM | : | CIVIL ACTION |
| FOR PHILADELPHIA ALTERNATIVE ASSET | : | |
| MANAGEMENT COMPANY, LLC, AND ITS | : | |
| PARTNERS, AFFILIATES, SUBSIDIARIES AND | : | |
| RELATED ENTITIES, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| MAN FINANCIAL INC., THOMAS GILMARTIN, AND | : | NO. 06-1944 |
| UBS FUND SERVICES (CAYMAN) LTD. | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN WALLACE, EDWARD GOBORA, DAVID | : | |
| LASHBROOK and SCOTT SOMERVILLE, | : | |
| Third Party Defendants | : | |

**<u>ORDER</u>**

AND NOW, this 12th day of September, 2007, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED as follows:

1. Plaintiff's Motion for Partial Summary Judgment as to the claim of negligent supervision is DENIED.

2. Man's Motion for Summary Judgment is DENIED as to the statute of limitations issue, and as to Plaintiff's claim charging violation of the Commodity and Exchange Act.

3. The Court will continue to consider the other issues raised in the various Motions for Summary Judgment.

BY THE COURT:

s/Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

O:\CIVIL\06-1944 Hodgson v. Gilmartin\Harmelin v. Man 06-1944 - Memo no. 1 Summary judgment.wpd