**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN J. HARMELIN, RECEIVER AD LITEM FOR PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC, AND ITS PARTNERS, AFFILIATES, SUBSIDIARIES AND RELATED ENTITIES, et al. | : : : : : : : | CIVIL ACTION |
| v. | : : | |
| MAN FINANCIAL, INC., THOMAS GILMARTIN, AND UBS FUND SERVICES (CAYMAN) LTD. | : : : | NO. 06-1944 |
| v. | : : : | |
| JOHN WALLACE, EDWARD GOBORA, DAVID LASHBROOK and SCOTT SOMERVILLE, Third Party Defendants | : : : : | |

**MEMORANDUM NO. 4 - RE: MOTIONS FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                                                    **October 10, 2007**

Third party Defendants John Wallace ("Wallace") and Edward Gobora ("Gobora") have

moved for summary judgment on all claims brought against them by Defendant and third party

Plaintiff Man Financial, Inc. ("Man").

**I.      Summary of Facts**

The undisputed facts and conclusions contained in Memoranda Nos. 1, 2 and 3 will not

be repeated. Philadelphia Alternative Asset Management Company, LLC ("PAAMCo") was

formed as a Delaware limited liability company on July 22, 2002. Wallace was named as one of

the members of the initial PAAMCo Board of Directors, and eventually became Chairman of the

Board. Gobora was at all relevant times an employee of PAAMCo. PAAMCo's office was

located in King of Prussia, Pennsylvania, but Paul M. Eustace ("Eustace"), previously identified as the mastermind of the fraud, was operative head of PAAMCo. Although having an office in Philadelphia, Eustace largely administered the company's business from his office in Canada. The initial meeting of PAAMCo directors took place on July 14, 2004, at which time Wallace was selected to serve as Chairman. Wallace had prior experience in securities, having served as Vice-Chairman of the Philadelphia Stock Exchange. Gobora also had prior experience in the securities industry, and was given certain assignments to work in the administration of PAAMCo's business operations.

There are disputes between the parties, supported by individual pieces of evidence as to how much authority and discretion Gobora had, and whether he acted at Eustace's direction in most instances, or substantially on his own. However, Man agrees that Wallace and Gobora did not determine the trading strategy or select trades for the Offshore Fund, and that this was done exclusively by Eustace. There are also disputes as to the nature and extent of Gobora's prior experience in securities work.

The Offshore Fund's Articles of Association identified PAAMCo as its "investment manager" and provided that the directors of the Offshore Fund would, on behalf of the Offshore Fund, enter into a "Investment Management Agreement" with PAAMCo.

On July 29, 2004, PAAMCo and the Offshore Fund entered into the Trading Advisory Agreement ("Agreement") which established the parameters of the contractual relationship between the two entities. PAAMCo agreed that it would have sole and exclusive authority for directing all of the Offshore Fund's trading activities. The Agreement states that it will be subject to New York law.

The parties' statements and counter-statements of facts (all supported by documents, deposition excerpts, etc.) contain many disputes about what occurred after the Agreement was executed and trading began. Wallace and Gobora assert their ignorance of the fraud being conducted by Eustace. Man points to evidence showing what Man characterizes as the signs of fraud that Wallace and Gobora should have paid attention to, but ignored. Although there is no suggestion that Wallace and Gobora knew anything about Eustace's intent to open the 50 Account, or its true purpose, Man presents evidence to show that both Wallace and Gobora were advised of the existence of the 50 Account within days of its having been opened in early March 2005. See Man Fact Statement No. 31. Wallace and Gobora's own Statements of Undisputed Facts, see ¶¶ 33-42, disclose their knowledge of the 50 Account, beginning as of early March 2005, and discussions which they had between themselves and with Eustace. There are disputed facts as to whether Wallace and Gobora should have paid more attention as to what was going on in the 50 Account or to the circumstances relating to its operation. Wallace and Gobora point to evidence showing they inquired about the 50 Account, but Eustace lied to them. Shortly thereafter, on or about April 18, 2005, Wallace and Gobora consulted counsel for advice on how they should handle the situation involving the 50 Account. See Factual Statement No. 48. In late April, and again in early May, Wallace visited Thomas Gilmartin, in Man's New York office; although the parties disagree about what took place, the facts may be relevant as to their respective knowledge of the 50 account.

In late May 2005, there was a margin call and also a notice from the National Futures Association ("NFA") which raised substantial concerns about the Offshore Fund, and which shortly lead to the investigation by the CFTC and apportionment of the Receiver.

## II.   Contentions

### A. Pleadings

The amended Third Party Complaint contains 134 paragraphs of factual allegations before stating any claims.  The third claim is for common law indemnification against Wallace and Gobora for breach of fiduciary duty, and the fourth claim is against Wallace and Gobora for common law indemnification for negligence.

In the seventh claim, Man seeks apportionment and contribution against all of the third party defendants, including Wallace and Gobora.  Contribution is only proper as to joint tortfeasors.  The RAL has specifically sued Man for negligence.  Clearly, the facts alleged by Man against Wallace and Gobora, all of which have been incorporated into the seventh claim, see paragraph 180, assert negligence.  The Court must interpret the claim for contribution as an assertion that if Man is held liable to the RAL for negligence, Man will proceed for contribution against Wallace and/or Gobora, as joint tortfeasors.  Although Man has not used the phrase "Joint Tortfeasor" in its third party claim, there can be no other rational construction of the seventh claim for apportionment and contribution.

### B.  Summary Judgment

To support their motion for summary judgment, Wallace and Gobora argue that Man's Amended Third Party Complaint has been brought in contravention of Rule 14, F. R. Civ P., claiming that Man lacks standing to bring a direct claim for negligence or breach of fiduciary duty against Wallace and Gobora.  Wallace and Gobora assert that they, respectively, an officer/director and employee of PAAMCo, did not owe any duty to Man, and that Man has improperly attempted to manufacture standing by asserting claims for negligence and fiduciary

-4-

duty, seeking indemnification[1] and contribution.

Wallace and Gobora argue that Man's third party claim for contribution, which de ends on finding that Man and third party Defendants Wallace and Gobora are potentially liable as joint tortfeasors, must fail because, under Man's evidence, taken in its most favorable light, th y did not breach any duty, and therefore they can not be liable under a theory of negligence. A o, Man can not rest its negligence claim against them based on any breach of fiduciary duty as to PAAMCo.

## III.   Discussion

### A.    Rule 14

The initial dispute concerns the extent of Rule 14, F. R. Civ. P., and whether Man s Amended Third Party Complaint is proper. The rule provides that a third party complaint nay be "served upon a person not a party to the action who is or may be liable to the third party p aintiff for all or part of the plaintiff's claim against the third party plaintiff." In the absence of an / controlling precedent by the Supreme Court or the Court of Appeals, a review of numerou district court cases shows a wide ranging difference in the approach to allowing third part complaints.

Wallace and Gobora rely on cases such as <u>Morris v. Lenihan</u>, 192 F.R.D. 484, 488 (E.D.Pa. 2000), which restates an appropriate test to determine whether the defendants can

---

[1]The Court repeats the ruling in Memorandum No. 3 granting in part the summary judgment motion made by third party Defendants David Lashbrook and Scott Somerville t at Man does not have any claim for indemnification against any of the third party Defendants Man's claim for indemnity is not based on any contract, but rather on common law indemn ty, which does not apply as to Wallace and Gobora, just as it did not apply to Lashbrook and Somerville, for the reasons stated in Memorandum No. 3.

properly bring a third party complaint, "a direct line of liability must be alleged to exist between the third party plaintiff and third party defendant independent of that between the first party plaintiff and defendant." Wallace and Gobora argue that there is no possibility of any such "direct line of liability," if only because the relationship between the Offshore Fund, on whose behalf the Receiver Ad Litem, ("RAL") sues, and Man is totally different from the relationship between PAAMCo and Wallace/Gobora.[2]

Man argues that Rule 14 only requires two things. The first requirement is that the third party defendant be "directly" liable to the third party plaintiff for some portion of the plaintiff's claim. See Morris, 192 F.R.D. at 488, note 5. The second requirement is that the third party claim be "derivative," that is, "if defendant/third party plaintiff were found liable to plaintiff, then defendant/third party plaintiff has a right under substantive law to transfer his liability derived from the original complaint to third party defendant." Robinson v. United States, 162 F.R.D. 256, 258 (D.P.R. 1995). See also Doucette v. Vibe Records, Inc., 233 F.R.D. 117, 120 (E.D.N.Y. 2005).

Courts have construed Rule 14's requirements both narrowly and broadly. As an example of what may be termed a more narrow construction of Rule 14 is Judge Giles' decision in Tesch v. United States, 546 F. Supp. 526 (E.D. Pa. 1982), which dismissed a third party complaint on summary judgment on two grounds. The first interpreted Rule 14 to prohibit the joinder because

---

[2] As described in more detail in previous memoranda, the relationship between Man and the Offshore Fund was a brokerage relationship – Man served as the Offshore Fund's Futures Commodity Merchant. However, the relationship between PAAMCo and Wallace/Gobora was an employment relationship. Wallace served as PAAMCo's director/officer and employee and Gobora as PAAMCo's employee, with PAAMCo acting as the trading advisor to the Offshore Fund.

the pleading showed separate torts rather than a joint tort, committed by different persons with

different duties to the plaintiff at clearly different times, with neither party having the opportunity

to guard against the other's acts, and because the outcome of the defendant's third party claim

was not derivative or determined by the outcome of the plaintiff's claim against the defendant.

Id. at 530.  Judge Giles goes on to find, alternatively, that even assuming such a duty existed, the

undisputed facts establish there was no breach of that duty.

As an example of a broader construction of Rule 14, two district court judges within this

circuit have found that a third party complaint is proper even though it alleges a distinct theory of

liability against the third party defendant, as opposed to the theory of liability which the plaintiff

asserts against the defendant/third-party plaintiff.  See Wanta v. Powers, 478 F. Supp. 990 (M.D.

Pa. 1979), and Morales v. Ziniz, Inc., 2004 WL 1171226 (E.D. Pa. 2004).

Two important points are made in Feinaugle vs. Pittsburgh and Lake Erie Railroad 595

F. Supp. 316 (W.D. Pa. 1983), where the Court held "it is not proper to bring in a person or entity

as a third-party defendant simply because he is or may be liable to the plaintiff. . . . The plaintiff

has a right to choose the party against which he desires to institute his action, and the defendant

cannot compel the plaintiff to also sue a third party, whom plaintiff does not wish to sue, by

asserting in a third-party complaint direct liability between the third-party defendant and the

plaintiff."  [Citations omitted.]

Several cases draw a distinction as to whether to allow a third party complaint, based

upon the nature of the claim asserted and the relationships of the parties.  In Chao v. New Jersey

License Beverage Association, Inc., 461 F. Supp. 2d 303 (D.N.J. 2006), an ERISA case, the court

refused to allow a third party complaint against a reinsurance broker who was allegedly

responsible for underwriting, writing, and administrating reinsurance coverage for the plan, because there was no possible valid claim in this case under which the defendant and the reinsurance broker could be held to be joint tortfeasors, and therefore jointly and severally liable, whereas the court did allow a third party claim to be asserted against a different entity which had acted as the third party administrator for the defendant and could be a potential joint tortfeasor.

Similarly, in FHF Partners v. KMA Financial Group, LLC., 2007 WL 710287 (E.D. Pa. 2007), a claim for violation of federal and Pennsylvania securities laws, and also asserting common law fraud for failure to make disclosures in a private placement memorandum, the court held that a proposed third party complaint against an entity that had provided consulting services would be allowed, but a third party complaint against a law firm that had provided legal services would not be allowed. In making these distinctions, Judge Tucker of this Court reiterated the "direct line of liability" rule stated above, and referred to the applicable substantive law. In dismissing the claim against the law firm, Judge Tucker acted on alternative discretionary grounds that the claim against the law firm would introduce an unrelated controversy and unduly complicate the case at trial.

After reviewing the parties' briefs and the cases, the Court has determined the present case is unique because it has been brought by a Receiver Ad Litem for PAAMCo "and its partners, affiliates, subsidiaries, and related entities" (including defrauded investors) – an undeniably broad swath of interests, and this fact is important for several reasons. First, the RAL has made clear in his own pleadings and briefs that his theory of the case, suing Man and UBS Cayman directly, and relying on several different legal grounds, is that the direct Defendants ignored their duties and responsibilities to PAAMCo, the Offshore Fund, and its investors.

Although the RAL has sued Man on federal claims (RICO and the Commodities Exchange Act), underlying all the claims are common law theories including fraud and negligence -- exceedingly broad claims which, as the Court has already held, must be submitted to a jury. The RAL could have brought direct claims against Lashbrook and Somerville and given the broad nature of the entities for whom and which the RAL sues, he also could have brought claims directly against Wallace and Gobora.

In none of the Rule 14 cases cited by the parties or reviewed, did the Court find a plaintiff acting on behalf of such a broad based group of potential beneficiaries, acting in a representative capacity, and making such wide ranging claims. All of the cases reviewed had a much narrower focus. The Court concludes that the narrow interpretation of Rule 14 urged by Wallace and Gobora would not be appropriate in this particular case.

Wallace and Gobora rely heavily on Index Fund, Inc. v. Hagopian, 417 F.Supp. 738 (S.D.N.Y. 1976), a securities fraud and negligence case, in which two banks, named as defendants, sought to bring a third party complaint against two directors of a plaintiff corporation, alleging corporate waste. The court held that only the fund itself, or shareholders suing derivatively, could bring such a claim. As to the claims of securities fraud, Index Fund is well reasoned in dismissing the third party claims. However, the plaintiff in Index Fund also made claims of negligence against all defendants, including the two banks. Although the banks desired to bring a third party claim of negligence against the two directors, but did not specifically denominate them as joint tortfeasors, the Court refused to allow this third party claim. As noted above, in the present case, the RAL's claims are based on negligence, and the Man claims against Wallace and Gobora are also based in negligence. Even though Man does not use the term "joint

tortfeasor," Man's claim for contribution could not be based on any other theory, and to th s extent, Man's claim is not procedurally improper, despite the contrary holding of Index Fund.

Regardless of whether the Court would take a narrow or broad view of Rule 14, wh ether Wallace and Gobora are potentially liable to Man "on a direct line of liability" must depend not only on the unique facts surrounding RAL, as noted above, but also on an analysis of the si ite law claims. The more analytical cases hold that the decision as to whether a third party compl nt is proper requires a reference to governing state law and, as to the claim of contribution, whe her governing state law would allow a jury to conclude that if Plaintiff proved its claims again t Man, and Man proved its claims against Wallace and Gobora, then Man, on the one hand, and W illace and/or Gobora on the other hand, can be found to be joint tortfeasors.

## B.   Choice of State Law

As to the claim of contribution, Man, as well as Wallace and Gobora, assert that the e is a conflict between Pennsylvania and New York law. See Wallace and Gobora brief at pages 26-31, and Man brief pages 31-35.

The Court noted in Memorandum No. 3, footnote 5, that both Pennsylvania and Ne v York allowed contribution among joint tortfeasors. However the contentions in that case did not require a more detailed analysis of either Pennsylvania or New York law. Both Man, and W allace and Gobora, cite New York cases illustrating that New York allows contribution not only a nong joint tortfeasors but also among "current, successive, independent, alternative and even inte ntional tortfeasors." See Board of Education vs. Sargent 523 N.Y.S.2d 475, 478 (N.Y. 1987). Ho ever Pennsylvania law is more limited, providing for contribution among joint tortfeasors but ba ing contribution for intentional torts. TVSM Inc. vs. Alexander and Alexander Inc, 583 F. Supp.

1089, 1092 (E.D. Pa. 1984). However, the Court finds that Pennsylvania law is not as limited as Man asserts, because two parties can be joint tortfeasors even if they did not act together, but they caused a single injury that can not be apportioned. See Schiele vs. Simpson Safety Equipment Inc., 1992 WL 73588 (E.D. Pa. 1992).

Wallace and Gobora argue in their reply brief that a true conflict between Pennsylvania and New York contribution law does not exist, because Man is a Delaware Corporation, and therefore New York's interests would not be impaired by the application of Pennsylvania law to this dispute. Man asserts that New York law should apply because its headquarters are in New York, some of the records relevant in this case were kept in New York, and the trading advisor agreement, between PAAMCo and the Offshore Fund, stated that New York law would apply.

Under the principles of Hammersmith vs. TIG Insurance Co., 480 F.3d 220 (3d Cir 2007), in the important matter of contribution between joint tortfeasors, both Pennsylvania and New York have an interest in the application of their own laws, and therefore, a true conflict exists. Considering the relevant facts for the choice of law at issue, the Court concludes that Pennsylvania has the greater interest in the application of its law, basically because Pennsylvania, the place were PAAMCo's offices were located, and where Wallace and Gobora did their work, is the natural "center of gravity" to consider the claims which Man is making against Wallace and Gobora in its third party complaint. The fact that Man had headquarters in New York, and that the trading advisory agreement specified New York law, are relevant but weaker factors. The location of PAAMCo's operations and employees in Pennsylvania is more directly important to the interests of a state than the place of corporate headquarters, and governs the choice of state law to apply in this case. Also relevant is the fact that Wallace and Gobora are residents of

-11-

Pennsylvania and would expect their conduct to be governed by Pennsylvania law. The governmental interests are roughly equal because both states have an interest in articulating and preserving the policy they have chosen for rights of contribution. The fact that claims of fraud, which involve an element of intent, are involved in this case, presents the most serious potential difference between the two state's laws. As noted above, New York law may allow a claim of contribution between intentional tortfeasors, whereas Pennsylvania would not. Individuals who reside in and conduct their business in Pennsylvania would rationally expect protection from liability under laws which bar contribution between intentional tortfeasors. Such individuals would rationally have different expectations for laws which only allow contribution between negligent tortfeasors. For all these reasons, the Court finds that Pennsylvania law should be the applicable choice of law.

Wallace and Gobora argue that under Pennsylvania substantive law, contribution is not available based on the nature of claims asserted against Man by the Receiver, but only as to the claims under RICO, the Commodity Exchange Act, and claims for intentional torts. The latter may include findings of common law fraud or aiding and abetting common law fraud. As to the negligence claim, Wallace and Gobora assert the operation of the comparative negligence doctrine would defeat such a claim because any jury verdict will have to be reduced to take into account PAAMCo's partial liability, and in doing so, the jury will necessarily consider the conduct of PAAMCo's directors, officers and employees, including Wallace and Gobora. See Wallace and Gobora brief at pages 33-34. The Court does not agree that such a verdict will necessarily include any individual liability Wallace and Gobora may have.

The parties' briefs also discuss the choice of law that applies to the claim for breach of

fiduciary duty, which, as noted above, was only pleaded within the claim for indemnificat on. However, both parties' briefs appear to argue that the issue of breach of fiduciary duty may be part of a claim for contribution. For the reasons discussed below, the Court will not allow the claim for contribution to include a claim for breach of fiduciary duty.[3]

## C.      Count VII - Apportionment and Contribution

Because the Court is not considering Man's indemnification claims against Wallace and Gobora, the only issue remaining is whether to grant or deny Wallace and Gobora's motion for summary judgment, asserting that there is insufficient evidence in the record  to allow a jury to

---

[3]Wallace and Gobora argue Delaware law as the applicable governing law for fiduciary duty issues because PAAMCo was organized under Delaware law.  Although Delaware law does have a defined and protective articulation of the "business judgment rule", it is not significantly different from Pennsylvania law.  As an example, the statement of the Delaware Business Judgment Rule has often been articulated by the Supreme Court of Delaware, such as in Brehm v. Eisner, 746 A.2d 244 (2000).  "[T]he business judgment rule has been well formulated  .  . directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner than cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." [citations omitted  Id. at 264, FN 66.

Pennsylvania has a similar Business Judgment Rule, stated by its Supreme Court in cases such as Cuker v. Mikalauskas, 692 A.2d 1042 (1997).  "The Business Judgment Rule insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interest of the corporation." Id. at 606.  See also a decision by Judge Broderick of this Court in Enterra Corp. v. SGS Associates, 600 F. Supp. 678 (E.D. Pa. 1985).

Wallace and Gobora also rely on the internal affairs doctrine.  See Beard v. Elster, 160 A.2d 731 (Del. 1960) (issuance of stock options by independent and disinterested board of directors is not reviewable by court under internal affairs doctrine).  Pennsylvania has a similar rule, but it is basically a choice of law rule, that courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation. Banjo Buddies, Inc. v. Renosky, 399 F.3d 168 (3d Cir. 2005) (noting that Pennsylvania has adopted the internal affairs doctrine by statute).

find that they were negligent.

The Court first rejects an argument which Wallace and Gobora make, as did other parties, that this Court must respect organizational and contractual documents marking a strict demarcation between the Offshore Fund and PAAMCo. As noted in prior Memoranda, the RAL has asserted, with substantial evidentiary support, that Eustace controlled both the Offshore Fund and PAAMCo, and treated both as tools for his fraud. For purposes of summary judgment motions, the Court will respect the RAL's substantive demonstration that Eustace, the Offshore Fund and PAAMCo were a coordinated triumvirate, distinctions were blurred, and legal arguments that the liability of any party in this case must be determined by the terms contained in the formal agreements, are rejected.

## 1. Negligence

As to the more general allegations of negligence, Man relies on Gobora's duties of complying with the following obligation of PAAMCo to the Offshore Fund as found in ¶ 1(c) of the Trading Agreement:

> Trading Reconciliations. The trading advisor acknowledges its
> obligation to review its commodity interest positions on a daily
> basis and to notify the Fund promptly of any errors committed by
> the trading advisor or any trade which the trading advisor believes
> was not executed in accordance with its instructions and which
> cannot be promptly resolved.

Man also relies on Gobora and Wallace not fulfilling their obligation, as found on page I - 3 of the PAAMCo Compliance Manual, about keeping investors informed. Man also points out that, even though Gobora knew about the 50 Account, he continued doing the account reconciliations and accepting additional funds for investment with knowledge that PAAMCo and

UBS were not reporting the 50 Account. Man cites facts to show, similarly, Wallace was continuing to act with knowledge of the 50 Account, but not doing anything different with that knowledge than previously.

Wallace and Gobora's own Statements of Undisputed Facts, see ¶¶ 33-42, disclose their knowledge of the 50 Account, beginning as of early March 2005, and discussions which they had among themselves. They retained counsel, Alexander Kerr, Esquire, following their knowledge of the 50 Account.

Wallace and Gobora argue that because they consulted outside counsel, they rationally assert they fulfilled their duties, while Man makes potentially persuasive arguments that they should have furthered their inquiry by questioning additional Man employees, consulted the full board of PAAMCo, and the directors of the Offshore Fund, or moved more quickly to retain further investigators or, as eventually recommended by their outside counsel, retained a forensic accounting firm to examine the books in more detail.

Although Wallace and Gobora justify their conduct, the Court cannot conclude after reading the briefs of Man and other facts supported in the record, that Wallace and Gobora's version of the events, or their reasons for doing what they did, must be accepted as true. A jury could rationally find that their duties, in the overall context and totality of circumstances, which this Court has described in other Memoranda, required more on their part. The large funds invested in the Offshore Fund, for which PAAMCo was the trading advisor, mandated Wallace and Gobora, who were to some extent responsible for the operations of PAAMCo, following a standard of care, notwithstanding that Eustace lied to them and concealed his fraud from them. The Court has reviewed the briefs and the documents supporting Wallace and Gobora's motions

for summary judgment, and Man's responses, and cannot say, as a matter of law, that their position must prevail over other evidence which might lead a jury to find them negligent.

Wallace and Gobora also argue that the business judgment rule and the internal affairs doctrine (see n. 3) basically immunize them from liability in this case. Man replies that the cases uniformly hold that these doctrines are applied only in derivative suits or similar shareholder litigation, and do not preclude liability of individual directors, officers or employees for allegedly tortious conduct committed, whether in the course, of or related to, their relationship/employment with the corporation. The Court will reject Wallace and Gobora's argument. Delaware, Pennsylvania and New York follow principles that an officer or director of a corporation (as well as an employee) may be personally liable for a tort to a third person where the corporation owed a duty of care to that person. See Donsco v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978). This rule has been uniformly applied by Courts applying Pennsylvania, Delaware and New York law. See Brandywine Mushroom Co. v. Hocksessin Mushroom Prod., Inc., 682 F. Supp. 1307 (D. Del. 1988); Talansky v. Schulman, 770 N.Y.S.2d 48 (App. Div. 2003); Max Daetwyler Corp. v. Input Graphics, Inc., 541 F. Supp. 115 (E.D. Pa. 1982).

Man's discussion of facts, which the Court has found sufficient to require a jury trial on its claim for contribution, are included in portions of its brief discussing fiduciary duty. Although for reasons stated elsewhere in this Memorandum, the Court will not permit Man to proceed on a claim of breach of fiduciary duty, the Court does acknowledge that many of the facts in the record which Man cites in support of its claim of a breach of fiduciary duty, are relevant and

---

[4]Considering individual liability, the Court may consider the Business Judgment Rule and the internal affairs doctrine in assessing the conduct of Wallace and Gobora in considering motions for directed verdict, and if necessary, formulating jury instructions.

presumptively admissible in evidence, as to Man's claim for contribution based on a theory of negligence. In other words, although the Court will not allow Man to proceed on a claim of breach of fiduciary duty, many of the facts asserted in support of that rejected claim have been considered, and will be admitted into evidence, under the claim for contribution based on negligence.

## 2.    **Fiduciary Duty**

Man's specific claim for fiduciary duty is only made in support of the rejected claim for indemnification. The few cases discussing the relationship between fiduciary duty and negligence establish, to the Courts satisfaction, that a claim of breach of fiduciary duty can not be subsumed within an overall claim of negligence. Although Wallace and Gobora acknowledge a fiduciary duty to their employer, PAAMCo, and possibly to the Offshore fund and its investors,[5] they correctly assert they did not owe any fiduciary duty to Man. Man cites no facts or authority to warrant a fiduciary relationship running from a trading advisor to a broker. After considering cases such as Index Fund, because the RAL did not sue Wallace and Gobora at all, and did not sue Man for breach of fiduciary duty, Man cannot make such a claim against Wallace and Gobora by way of a third party action. As held in Adelphia Communications Corp., 322 B.R. 509 (Bankr. S.D.N.Y. 2005), a claim against partnership insiders for breach of fiduciary duty belongs to the limited partnership and cannot be alleged in a third party complaint for contribution and

---

[5] See Savage vs. CFTC, 548 F.2d 192, 197 (7th Cir. 1977) where the court stated, "Congress has already made the judgment that [t]rading advisors hold a fiduciary relationship," and Fraternity Fund, Ltd. v. Beacon Hill Asset Management, LLC, 376 F. Supp. 2d 385, 414* n. 182 (S.D.N.Y. 2005) where Judge Kaplan held, in denying a motion to dismiss, that the allegations were sufficient to support a fiduciary relationship between a hedge fund and its investment advisor, citing many cases that "have recognized fiduciary relationships between clients and their investment advisors."

indemnity.   See Flood vs. Makowski, 2005 WL 1501442 (M.D. Pa. 2005) (refusing to equate

claim for breach of fiduciary duty with a claim for negligence).


**IV.**     **Conclusion**

For the above reasons, the Court will grant Wallace and Gobora's Motion for Summary

Judgment as to Man's claims for indemnity, but deny it as to Man's claims for apportionment and

contribution as alleged in claim VII.


O:\CIVIL\06-1944 Hodgson v. Gilmartin\Harmelin v. Man 06-1944 - Memo no. 4 summary judgment.wpd