## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN J. HARMELIN, RECEIVER AD LITEM, et al. :      CIVIL ACTION

v.                                     :

MAN FINANCIAL INC., et al.                  :      NO. 06-1944

**FILED**

OCT 2 6 2007

MICHAEL E. KUNZ, Clerk

By_____Dep. Clerk

## MEMORANDUM No. 5 - RE: MOTIONS FOR SUMMARY JUDGMENT

**Baylson, J.**                                             **October 26, 2007**

Defendant UBS Fund Services (Cayman) Ltd. ("UBS") has moved for summary judgment on the Plaintiff's claim of Negligence, and on cross claims asserted by co-defendants. UBS has not moved for summary judgment of Plaintiff's claim of Breach of Contract.

UBS was initially brought into this lawsuit by Defendant Man Financial, Inc. ("Man") as a third-party defendant. The plaintiff in the action, a court-appointed Receiver, had not brought claims directly against UBS. The Court appointed Stephen J. Harmelin, Esquire, as Receiver Ad Litem ("RAL") for this case alone, for the reasons stated in the Court's Memorandum of May 3, 2007 (Doc. No. 241). The RAL subsequently determined to file a Second Amended Complaint ("SAC") in which Man (and its employee Thomas Gilmartin), (collectively "Man") and UBS, were named Defendants. This Court denied UBS's Motion to Dismiss the SAC on September 12, 2007 (Doc. No. 383). After a period of discovery, UBS moved for summary judgment on the Negligence claim in the SAC (Doc No. 400). Man had filed cross-claims against UBS (Doc. No. 315), and UBS seeks summary judgment on some of those cross-claims in a separate motion (Doc. No. 401).

1

The facts of this case concern a hedge fund called the Philadelphia Alternative Asset Fund, Ltd. (the "Offshore Fund").[1] Paul M. Eustace ("Eustace"), an admitted wrongdoer, established the Offshore Fund, and Philadelphia Alternative Asset Management Company, LLC ("PAAMCo") was its Trading Advisor.[2] Eustace was PAAMCo's President. Eustace hired Man as the Offshore Fund's Futures Commission Merchant and UBS as the Offshore Fund's Fund Administrator. The Offshore Fund and UBS entered into an Administration Agreement on July 29, 2004. Detailed accounts of this case's factual background can be found in the Court's Memoranda of September 18, 2006 (Doc. No. 76), October 5, 2006 (Doc. No. 92), and December 22, 2006 (Doc. No. 141). Memoranda Nos. 1-4 adjudicated other dispositive motions in this case.

## I.   Contentions of the Parties

The RAL alleges that UBS appointed an unqualified and untrained employee to handle the Offshore Fund account, failed to properly supervise and monitor the Offshore Fund account, ignored internal policies and procedures regarding independent verification, and accepted Eustace's explanations for questionable activity without comprehending or verifying them. See SAC, at ¶ 20, ¶ 37-39, 42, 44, 51-55, 59, 61, 113-114, 209. The RAL asserts that this conduct amounted to a breach of UBS's duty to the Offshore Fund to act reasonably in the conduct of its

---

[1] UBS refers to the Offshore Fund, *i.e.* Philadelphia Alternative Asset Fund, Ltd., as "PAAF".

[2] Both the Offshore Fund and PAAMCo are among the Receivership entities. The Receiver was appointed for PAAMCo and its "partners, affiliates or subsidiaries, or related entities."

business.  See SAC at ¶ 208-209.  According to the RAL, this breach of duty enabled Eustace to continue and perpetrate his fraud, causing injuries (in the form of trading losses) to the Offshore Fund.  See SAC at ¶ 210-211.

UBS seeks summary judgment asserting that the RAL's evidence is insufficient to show causation.  UBS contends that none of the acts or omissions by UBS directly caused the Offshore Fund's losses, that the RAL merely shows that Eustace lied to UBS, and that Eustace, not UBS, caused the Offshore Fund's losses.  According to UBS, such evidence is not sufficient to find that UBS's actions were a substantial contributing factor in bringing about the Offshore Fund's losses and thus does not show that UBS was a legal cause of injury to the Offshore Fund.  UBS also contends it was not a joint tortfeasor with Man.  Finally, UBS attacks the RAL's causation claim by asserting that the RAL's causation arguments are speculative.

The RAL, in turn, argues that UBS was indeed a proximate cause of the damages to the Offshore Fund.  The RAL asserts that UBS can still be a proximate cause of the relevant damages even when it is not alleged to be the sole cause of the damage.  According to the RAL, there is a jury issue on causation and a plaintiff need not describe the exact damage caused by each particular set of alleged negligent acts.  The RAL also contends that it does not need to specify the actions that UBS could have taken to prevent the fraud; the evidence that UBS should have taken action to prevent the fraud suffices.  In addressing UBS's final set of contentions, the RAL asserts that UBS's speculation argument is simply a repackaging of its causation argument.

## II.   **Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

III.   **Choice of Law**

UBS has made a substantial showing, not contested by the other parties on this motion,

that although the Administration Agreement specified that Cayman law would apply to disputes between UBS and PAAMCo, there is no conflict between Cayman law and Pennsylvania law on the issues presented, and the Court can apply the law of either jurisdiction.

## IV.    General Principles of Causation

In general, when there are substantial questions of negligence and causation, "both the Seventh Amendment and the common law require that only the jury resolve them." Arkwright Mut. Ins. Co. v. Philadelphia Elec. Co., 427 F.2d 1273, 1275 (3d Cir. 1970). There are two kinds of causation, "but for" causation and proximate cause, both of which are generally necessary to establish legal causation. For UBS to be the proximate cause of the alleged harm to the Offshore Fund, the RAL must show that its conduct was a "substantial factor" in bringing about the trading losses that Eustace incurred.[3]

It is true that in certain instances, when assessing proximate cause, a trial court may find that the plaintiff has not submitted sufficient evidence on causation and grant a defendant's motion for summary judgment for that reason. See Bushman v. Halm, 798 F.2d 651, 657 (3d Cir. 1986) ("Where there can be no two factual conclusions, or where there is some applicable rule of law decisive of the issue, it is the function of the court to determine whether a defendant's conduct is the legal cause of plaintiff's harm.") Cases appropriate for summary judgment on causation involve situations where reasonable minds could not differ on the causation element. However, if reasonable minds could differ as to causation, the issue of causation should go to the

---

[3] Under Pennsylvania law, proximate cause can be established by a finding that a defendant's negligent act or failure to act was a substantial factor in bringing about the alleged harm. Jones v. Montefiore Hosp., 431 A.2d 920, 923 (Pa. 1981).

jury.  See, e.g. Redland Soccer Club, Inc. v. Department of Army of U.S.C.A., 55 F.3d 827, 851

(3d Cir. 1995) (evaluating a motion for summary judgment and explaining that the question of

what contributes substantially to an outcome is "an issue of degree that is usually a question for

the factfinder").  See also Gutzan v. Altair Airlines, 766 F.2d 135, 140 n. 6 (3d Cir. 1985) (citing

Hamil v. Bashline, 392 A.2d 1280, 1285 (Pa. 1978)). [4]

V.      **Discussion**

        As discussed extensively in Memoranda Nos. 1-4, the RAL's allegations against Man

focus on the establishment of the "50" account by Eustace, his manipulation of the Offshore

Fund's losses into the 50 account, and the RAL's evidence that Man did not appropriately deal

with that situation.  An undisputed fact concerning UBS is that Eustace had restricted access to

Man's electronic accounts so that UBS was not advised of the existence of, and did not have

access to, the 50 account, which was established in late March 2005.  However, the Plaintiff, in

support of his direct claim against UBS, and Man, in support of its cross claim against UBS, have

---

[4] To the extent there is a question as to the "quantum of evidence" necessary to establish a jury question on causation under Pennsylvania law, the Third Circuit restated the standard in Kridler v. Ford Motor Co., 422 F.2d 1182, 1184 (3d Cir. 1970).  Under Pennsylvania law, a jury question arises if "the evidence presented (is) such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the only one which logically can be reached.  It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability." Id. (quoting Smith v. Bell Telephone Co., 153 A.2d 477, 479-480 (Pa. 1959)).  The Third Circuit has also found that the same standard applies under federal law. Id. at 1183-1184. ("Although there has been some dispute in other cases as to whether state or federal law governs [this standard], this Court previously considered the question and found that there is no difference in the standard followed in the Pennsylvania courts and in the federal courts.") [As discussed throughout this memorandum, the Court finds the RAL has submitted sufficient evidence for a reasonable jury, without resort to prejudice or guess, to reach the conclusions the RAL seeks.]

focused on facts that arose long before Eustace established the 50 Account.

UBS has filed a statement of facts, which to some extent, are undisputed and reiterate the contents of the basic documents under which the Offshore Fund was established, and UBS became administrator, through an Administration Agreement, dated July 29, 2004.  Although UBS does not, in  moving for summary judgment on the RAL's claim of negligence because of insufficient evidence of causation, admit or deny negligence, the fact statements of UBS, the RAL and Man are filled with significant disputes about UBS's acts or omissions prior to the establishment of the 50 account.  For purposes of this motion, UBS has assumed the RAL's allegations regarding its conduct as true.  See UBS Reply Brief p. 3.  Nonetheless, these factual disputes are relevant in determining the Motion for Summary Judgment on the issue of causation and therefore they will be discussed.  For present purposes, most disputed facts concerning UBS's Motion revolve around its contractual undertaking to calculate the net asset value ("NAV") at the end of every month, upon which the investors relied in assessing the performance of the Offshore Fund.

The RAL and Man focus first on three checks totaling $607,000 which Eustace sent to Man Financial on July 29, 2004 requesting that they be credited to the Offshore Fund's trading account at Man Financial.  A Man employee approved Eustace's request and credited the 10 account.  Eustace told Jason Perras, a UBS employee, that the $607,000 was profit earned by the Offshore Fund that had been erroneously omitted.  Mr. Perras then included the $607,000 as profit and as an asset of the Offshore Fund, in the July NAV.  The RAL and Man assert that Perras should have questioned Eustace about this, demanded to see some independent verification, or discussed the matter with a supervisor.  There is evidence Mr. Perras did none of

these. Although the RAL and Man do not seriously contend that this transaction, in late July 2004, in and of itself caused the vastly more significant losses which eventually occurred, they cite this as the first of several instances in which UBS did not check or verify what Eustace said. According to the RAL and Man, if UBS had performed such a check or verification, then arguably, UBS would have at least realized that Eustace could not be trusted, and a higher level of scrutiny would have been established for his representations, which would have prevented the subsequent fraud.

The next topic concerns a type of trade called Exchange of Futures for Physical ("EFP") which the parties describe differently. UBS asserts that an EFP is a transaction in which one party exchanges its future contracts for another party's physical commodity, and allows an individual holding futures contracts to "exchange" those future contracts for the underlying commodity (in Eustace's case, currency) at a privately negotiated price. The RAL asserts that in an EFP transaction, the parties trade an exchange-traded futures position in connection with a privately negotiated physical trade. Instead of offsetting a futures position with a subsequent trade on an exchange, as would be more usual, a participant in an EFP trade transfers the futures position to the other party to the EFP trade in exchange for a negotiated physical trade. A result of the EFP is that the futures position is offset and closed down for one participant, and the other participant acquires it. Man asserts that EFP's are "transactions in which one party buys the physical commodity and simultaneously sells (or gives up a long) futures contract while the other party sells the physical commodity and simultaneously buys (or receives a long) futures contract." See Fact Statements No. 31. The differences in these definitions is not material.

A number of these EFP trades had taken place on the first trading day of five months

between November 2004 and June 2005, but Eustace represented to UBS that they were actually made on the last day of the previous month, for the purpose of fraudulently boosting the NAV for that month. There is substantial evidence in the record that UBS employees accepted Eustace's representations and backdated the trades to the prior month, without any independent verification with Man Financial, or any other source. The RAL and Man cite UBS's own policies and procedures which establish the need for independent verification. The parties do not dispute that the backdating to the last day of the previous month had the effect of increasing the NAV for that month.

There is evidence that, based on Eustace's misrepresentations, UBS backdated a total of 59 EFP trades, which added over $34 million to the Offshore Fund's NAV from late October 2004 to early June 2005. The RAL also points to evidence showing that the UBS reconciliations that took place, pursuant to Eustace's fraud, increased the NAV each month in which the reconciliations were done, and there was no month in which the reconciliations resulted in a decrease in the Offshore Funds NAV. Part of the fraud consisted of Eustace doctoring emails that reportedly were sent from Man Financial to Gobora, a PAAMCo employee, who forwarded them to UBS employee Perras. See Fact Statements 32-55.

The Court notes significant factual disputes as to whether a jury would find that the reliance of UBS and its employees on Eustace was reasonable, or whether, under all of the circumstances, verification and investigation should have been performed. These factual disputes, although relevant on the issue of negligent acts or omissions, also go to the essence of the concept of causation. As noted above, although UBS does not assert the absence of negligence as a ground for summary judgment, neither does it admit negligent acts or omissions;

it allows the Court to assume, for purposes of the Motion, that its acts or omissions were below the standard of care. However although the Court may, for purposes of summary judgment, note factual issues in the case concerning allegedly negligent acts or omissions, the nature of the case does not allow the Court to segregate the facts which the RAL will rely on as proof of negligent acts or omissions, from facts that are relevant on causation.[5] As the Court considers the papers on the UBS motions, it cannot simply isolate the facts which may allow the jury to find negligent acts or omissions, and conclude, that if negligence is proved, the same facts would not also allow the jury to find proximate cause.

In its assertions that the Court should grant summary judgment for lack of causation, UBS has pointed to facts showing that Eustace actively committed a series of fraudulent acts which prevented UBS from accurately calculating the NAV, and UBS argues only Eustace, or Man and Eustace, caused the Offshore Fund's losses. In contrast, the RAL and Man have pointed to facts from which a jury could find that had UBS performed the verification and independent investigation required by its internal policies, it would have prevented or lessened the Offshore Fund's losses.

**A.**     **Causation**

As noted above, under Pennsylvania law, an entity is the proximate cause of the alleged harm if it was a substantial factor in bringing about the harm. UBS argues that it was not a substantial factor in bringing about the alleged trading losses and thus can not be the proximate cause of those losses. One of UBS's theories appears to be that since Eustace intentionally

---

[5]The same is true, to some extent, for the breach of contract claim, as to which UBS does not move at all. Of course, there is no "causation" requirement in a breach of contract claim, but the Plaintiff must prove that the breach was material and what damages flowed from the breach.

committed fraud, any negligence on the part of other actors could not be a "substantial factor" in causing the alleged harm. This theory is misguided. If an entity negligently creates the opportunity for a fraudulent or even criminal act, the crime or fraud does not necessarily relieve the entity of its negligence. If the superceding crime or fraud was foreseeable, the negligence is not excused. See Mahan v. Am-Gard, Inc., 841 A.2d 1052, 1061 (Pa. Super. 2003) ("It is true that an actor may still be liable for his negligence despite the superseding criminal acts of another if, at the time of his negligent conduct, he realized or should have realized the likelihood that such a situation might be created and that a third person might avail himself of the opportunity to commit such a tort or crime.") (Internal citations omitted.) A jury could rationally conclude that it was foreseeable that an individual, here Eustace, intending to commit fraud, realized that he could take advantage of the alleged absence of independent verification by UBS. The plaintiff has made much of an email where Eustace inferentially refers to Mr. Perras as "Dumb and Dumber." See RAL Ex. 15. The Court does not know what the jury will find concerning this phrase. It may just be an anecdotal opinion, or it may reflect a more malevolent attitude by Eustace against Perras and/or UBS. It may allow the jury, as the RAL contends, to assume that Eustace thought he had successfully defrauded Perras and UBS, and could commit his further acts of fraud without any concern about being discovered.

As discussed above, the issue of proximate cause should go to the jury when reasonable minds could differ as what was a substantial factor in bringing about the alleged harm. Here, reasonable minds could certainly differ as to the role UBS's conduct played in bringing about the trading losses to the Offshore Fund. For example, although the Court is not endorsing this position, a reasonable jury could conclude that UBS's regular backdating of the EFP trades was a

substantial factor in allowing Eustace to show non-existent gains of $34.68 million.  See RAL's

Brief at 5.

Having reviewed the applicable law on causation, the Court concludes that a jury could

find that UBS's acts and omissions were a substantial factor in the Offshore Fund's losses.

### B.    Joint Tortfeasor Issue

UBS also vigorously asserts that there is no evidence that UBS could be a joint tortfeasor

with Man, because their acts were different in nature, and performed at different times.

However, the evidence shows that Eustace's fraudulent acts were not separate performances,

each requiring a separate ticket of admission, but rather, Eustace authored and directed a

continuous drama, with one scene of fraud after another unfolding, seriatum, with a tragic ending

for the Offshore Fund and its investors.

A clear definition of "joint tortfeasors" is found in Voyles v. Corwin, 441 A.2d 381, 383

(Pa. Super. 1982).

> In determining whether the harm to a plaintiff is capable of apportionment,
> that is, whether the defendants are separate or joint tortfeasors, courts consider
> several factors: the identity of a cause of action against each of two or more
> defendants; the existence of a common, or like duty; whether the same evidence
> will support an action against each; the single, indivisible nature of the injury to
> the plaintiffs; identity of the facts as to time, place or result; whether the injury is
> direct and immediate, rather than consequential, responsibility of the defendants
> for the same injuria as distinguished from damnum.

(Citing Prosser, Law of Torts, § 46 n. 2, (4th ed. 1971)).

Also relevant in this context is Rabatin v. Columbus Lines, Inc. et. al., 790 F.2d 22 (3d

Cir. 1986) (not cited by the parties), an appeal from a jury verdict finding both defendants were

joint tortfeasors when one defendant was found liable on a theory of strict liability and the other

12

was found liable for negligence. Relying on its prior opinion in <u>Chamberlain v. Carborundum Corp.</u>, 485 F.2d 31 (3d Cir. 1973), which had upheld a finding that two defendants were joint tortfeasors "because they both could have guarded against each other's conduct and thereby prevented the employee's death," <u>Rabatin</u>, 790 F.2d at 26, the Court affirmed the verdict in the <u>Rabatin</u> case that both defendants were joint tortfeasors. The following language, in the present factual context, would support the RAL's theory of causation as to Man and UBS, and allow a jury to find that both were joint tortfeasors.

> Applying these principles, we conclude that Columbus and Union Carbide are joint tortfeasors. Each had the opportunity to prevent Rabatin's injuries. Union Carbide *could have* refrained from marketing a defective product, and Columbus *could have* taken appropriate precautions prior to the accident when it first learned that the eyebolts were cracking. Moreover, each of the tortfeasor's acts combined to produce a single, indivisible harm. It would be impossible to apportion Rabatin's harm between them. Accordingly, we hold that Union Carbide is entitled to contribution from Columbus in the amount of Columbus' pro rata share of the total damages, namely fifty percent.

<u>Rabatin</u>, 790 F.2d at 26 (emphasis added).

UBS relies on <u>Harka v. Nabati</u>, 487 A.2d 432 (Pa. Super. Ct. 1985) to argue that because the RAL's purported evidence against UBS differs from the RAL's purported evidence against other defendants, UBS and other defendants can not be joint tortfeasors. <u>See</u> UBS Reply Brief at p. 7. In <u>Harka</u>, an individual died in the hospital after being struck by a roll of fencing that was negligently secured to a vehicle. The individual's estate brought a wrongful death action against the people who had secured the roll of fencing to the truck and added the doctor and hospital as additional defendants. The <u>Harka</u> court addressed whether the people who secured the fencing and the doctor/hospital could be joint tortfeasors, and found that they were not joint tortfeasors for a series of reasons. <u>Harka</u>, 487 A.2d at 435. Among these reasons was the fact that different

13

evidence would be utilized against the defendants. Id. ("Negligence alleged against a physician in a wrongful death action will necessarily involve different legal theories and defenses, different evidentiary problems, and different factual determinations than would a negligence action against a truck driver who negligently loaded his vehicle in a dangerous manner.")

The Court finds the case at bar to be distinguishable from Harka. In Harka, there were two distinct allegedly negligent events that were clearly separate:  placing fencing onto a truck and providing medical care.  Furthermore, in Harka, there was no previous relationship between the truck drivers and the doctor/hospital.  In contrast, in the case at bar, the RAL has alleged a series of negligent acts or omissions against UBS and other defendants, all of whom had a commercial/contractual relationship through PAAMCo, with one another.  A jury could find these allegedly negligent acts or omissions were related temporally and by Eustace's continual acts of fraud.

Not all of the wrongdoing alleged by the RAL can be clearly categorized as joint tortfeasor activity, although it is important to note that under Pennsylvania law, parties can be joint tortfeasors if they did not act together, but they caused a single injury that can not be apportioned.  See Summary Judgment Memorandum No. 4 (Doc. No. 435), p. 11 (citing Schiele v. Simpson Safety Equipment Inc., 1992 WL 73588 (E.D. Pa. 1992)).  As noted above, some of the alleged wrongdoing in this case indeed qualifies as joint tortfeasor activity and therefore distinguishes the case at bar from Harka.

Applying the above legal principles to the factual issues described, the Court rejects UBS's argument that Eustace's fraud was the sole or "legal cause" of the Offshore Fund's losses, or that all losses were due to the 50 account scenario.  It must be remembered that a significant

14

aspect of the RAL's claims against UBS deal with omissions, rather than any specific acts. Nonetheless the use of the EFP trades to overstate the NAV for a number of consecutive months may have not only led to the overstatement of the NAV, but may have contributed to Eustace's belief that he could get away with further fraud by establishing the 50 account. As the RAL notes in his response to Fact Statement No. 33, going back to the first use of EFPs, "if Perras had downloaded the actual November 1, 2004 daily statement from the eMidas system, he would have discovered that Eustace had fraudulently doctored the statement by adding the three EFP trades."

UBS asserts on page 4 of its Reply Brief, that the RAL's evidence only "created a situation harmless unless acted upon by other forces for which the actor is not responsible." According to UBS, relying on Midget v. Walmart Stores Inc., 317 F. Supp. 2d 550, 564 (E.D. Pa. 2004), affirmed, 121 Fed. Appx. 980 (3d Cir. 2005), this showing is insufficient. The Court disagrees that UBS's alleged conduct has created a "harmless" situation. UBS's acts and omissions may have allowed the continuous overstatement of the NAV, itself causing some harm to the Offshore Fund and its investors. A jury could find that this was a substantial factor in causing the final, total injuries to the Fund. Furthermore, Midget found that the defendant could not have prevented the harm that occurred in that case. Midget, 317 F. Supp. 2d at 565. Here, the Court refuses to find that UBS could not have prevented the alleged injuries.

This Court relies on the Third Circuit decision Rabatin, supra, which clearly holds, sufficient for liability, evidence of conduct that a jury found "could have" been taken, and if taken, might have led to "appropriate precautions prior to the accident." Rabatin, 790 F.2d at 25-26. In Rabatin, the Court analyzed the defendants' failure to take action to prevent the accident

in holding there was sufficient evidence that defendants' acts or omissions were proximate causes of the accident and that defendants were joint tortfeasors.

From all of the evidence, the jury may conclude that UBS and Man, although independently negligent, were not joint tortfeasors. However, there is evidence from which the jury could conclude they were joint tortfeasors. Specifically, the jury may find that the aggregate overvaluation of the Offshore fund, due to the erroneous NAV calculations, had a direct effect on Eustace deciding to open the 50 account to hide losses that he was about to incur, and that the acts and omissions of UBS were one of several factors that led Eustace to create the 50 account and conceal its existence from UBS. On the other hand, the jury may find that Eustace was the sole cause of the losses, and render a verdict that exonerates both UBS and Man.

**C.    Speculation**

UBS also argues that the RAL's negligence theory constitutes speculation and thus does not provide the necessary causation element of a negligence claim. The Court finds that UBS's "speculation" argument is a form of "causation" argument. UBS essentially argues that the RAL must be able to conclusively show exactly how UBS caused the alleged harm.

In opposing UBS's motion for summary judgment, the RAL need not conclusively prove that UBS caused the alleged harm. At this stage of litigation, plaintiff must show that a jury could rationally find that UBS's conduct was a substantial factor in bringing about harm to the Offshore Fund. See footnote 4, supra.

A plaintiff must indeed show that defendant was a substantial factor in bringing about the alleged harm, but "Pennsylvania law has long recognized that this substantial factor need not be, as the trial court incorrectly charged, the only factor, i.e. 'that cause which . . . produces the

16

result. A plaintiff need not exclude every possible explanation, and 'the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." Jones v. Montefiore Hosp., 431 A.2d 920, 923 (Pa. 1981) (internal citations omitted). See also Powell v. Drumheller, 653 A.2d 619 (Pa. 1995).

When a defendant is alleged to have joint responsibility for causing harm, as UBS is here, the plaintiff need not show a single, conclusive chain of events in order to show that the defendant could be a substantial factor in causing the harm. Negligence can be cumulative and questions can remain as to what would have happened absent the alleged negligence.

## VII.   Cross Claims

As noted above, Man and Gilmartin filed cross claims against UBS (Doc. Nos. 315 and 316). The cross claims are stated, after numerous introductory factual allegations, in three counts: first, for indemnification for breach of fiduciary duty, second for indemnification for negligence, and third for apportionment and contribution. UBS seeks summary judgment on the claims for indemnification, and on the claim for contribution based on the alleged breach of fiduciary duty to the Offshore Fund. UBS does not move for Summary Judgment as to the claim for contribution based on negligence. See Doc. No. 401.

As held in prior memoranda, because there are allegations brought by the Receiver Ad Litem (RAL) asserting that Man and Gimartin were negligent, Man and Gilmartin do not have any claim for indemnification under applicable law. For the reasons stated in Memorandum No. 4, this cross-claim for negligence does not include a claim for breach of fiduciary duty.

17

Therefore, the UBS Motion (Doc. No. 401) will be granted with the understanding that Man's cross claim for contribution based on negligence remains in the case.

An appropriate order was filed on October 24, 2007.


BY THE COURT:

_____
Michael M. Baylson, U.S.D.J.

O:\CIVIL\06-1944 Hodgson v. Gilmartin\Harmelin v. Man 06-1944 - Memo no. 5 summary judgment.wpd